# EXHIBIT 34

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| SARAH PEREZ; MICHELLE LACKNEY; RACHEL STEWART; RACHEL HARDYCK, on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | |
| v. | |
| STATE FARM MUTUAL AUTOMOBILE INSURANCE CO., an Illinois corporation; ALLSTATE INDEMNITY CO., an Illinois corporation; GEICO GENERAL INSURANCE CO., a Maryland corporation; CERTIFIED AUTOMOTIVE PARTS ASS'N, doing business in Washington, D.C.; LIBERTY FIRE MUTUAL INSURANCE CO., a Massachusetts corporation; and UN-NAMED INSURANCE CONSPIRATORS, | Case No.  C06-01962 (JW) (PVT) |
| Defendants. | |

REBUTTAL DECLARATION OF DONALD T. BASHLINE

August 12, 2011

# I. INTRODUCTION

## A. Qualifications

1. My name is Donald T. Bashline and I reside in Watertown, Massachusetts. I am a consulting actuary doing business as Bashline & Associates.

2. I have been a fellow of the Casualty Actuarial Society since 1982, a fellow of the Canadian Institute of Actuaries since 1991, and a member of the American Academy of Actuaries since 1980.

3. I have testified as an expert at numerous rate hearings and legislative hearings, and have served as a consultant for many insurance regulatory agencies and insurers during my consulting career.

4. I worked as a consultant with the California Department of Insurance to help develop regulations implementing Proposition 103. Later, I was Director of the State Rating Bureau of the Massachusetts Division of Insurance. The State Rating Bureau was at that time responsible for production of private passenger automobile and workers' compensation rate filings used by the Commissioner as a basis for setting rates for all the state's insurers.

5. My curriculum vitae, which includes my employment history, is included as Appendix A to this declaration.

6. I co-authored an article, *Bad Behavior*, which appeared in the April 2005 issue of *Best's Review*. I also co-authored an op-ed in the Boston Globe of April 3, 2004, "Competition Won't Cut Auto Rates."

**B. Assignment**

7. I have been asked by the Plaintiffs' attorneys to evaluate and respond to the Declaration, Rebuttal Report and Supplemental Rebuttal Report of Frederick F. Cripe, and to the Supplemental Rebuttal Class Declaration of Daniel L. Rubinfeld. Appendix B to this declaration is a list of the documents I relied on in preparing this evaluation. I also relied on my experience of thirty-four years as an actuary.

8. I am being compensated at the rate of $450 per hour for my work on this case and have no financial interest in its outcome.

## II. SUMMARY AND CONCLUSIONS

9. Dr. Noll, in his Supplemental Report, presents three econometric models demonstrating his view that Allstate Insurance Company has not passed non-OEM parts savings along to policyholders as part of their premiums. Mr. Cripe, in his Supplemental Rebuttal Report, presents an opposing set of models and contends that Dr. Noll's models fail at their intended task.

10. In fact, Mr. Cripe's models do not support his contention. Since they deal with only the actuarially indicated rate and not the final rate level actually charged to policyholders, they cannot, by definition, be used to evaluate the efficacy of Dr. Noll's models, which analyze the actual premium charged to class members. Even if their relevance could somehow be shown, Mr. Cripe's models are oversimplified to the point of triviality, and are useless as a portrayal of either the actual Allstate data or the actual ratemaking process currently used by insurers.

11. Similarly, Dr. Rubinfeld, in his Supplemental Rebuttal Class Declaration, limits his analysis of the ratemaking process to its actuarial phase, excluding the

3

important business considerations that modify the formula-indicated rates and determine what each policyholder is charged.

12. These omissions render Mr. Cripe's and Dr. Rubinfeld's conclusions regarding Dr. Noll's models meritless. While Dr. Noll is modeling the actual rates charged to policyholders, the only rates of any relevance here, Mr. Cripe and Dr. Rubinfeld base their conclusions on indicated, not actual, rates.

## III. BACKGROUND

### A. The Ratemaking Process and Mr. Cripe's Models

13. Actuaries use data from the past to make rates for the future. Since conditions change over time, actuaries need to adjust the raw premium and loss data generated by past policies to anticipate as closely as possible conditions expected to prevail when the new rates are in force.

14. Inflation might have affected losses: they need to be trended to current cost levels. Some claims from the experience period may still be open: actuaries will estimate the ultimate settlement values of these claims and use those values in calculating expected rate period losses. Premiums may have been written at a different rate level: they need to be adjusted to current level. Random variation will affect both the number and nature of insured losses, and allowance may need to be made for that as well.

15. Expected losses for the new rate period (further adjusted to include provisions for insurer expenses and a fair rate of return) are then compared to expected premiums. The indicated overall rate change is simply the premium percentage adjustment needed to bring the two into balance. *See* for example Exhibit 1,

4

which presents one of Allstate's indicated rate calculations presented to the Department of Insurance.

16. Now, with an overall rate indication in hand, the actuary determines how that rate indication is translated into individual charges for specific policyholders. In order that costs may be allocated fairly among policyholders, insurers divide insurance buyers into a number of different classifications based on their individual characteristics. Some of these relate to the drivers themselves (driving record, years licensed, marital status), some to the use of the vehicle (location of vehicle, use in business, miles driven), others to the vehicle itself (make, model, price). Allstate has over 30 rating factors, many of which have a range of possible values, so that the number of possible classifications is in the tens of thousands. Company actuaries will compute relativities enabling the calculation of rates for buyers with any feasible combination of factor inputs.

17. Both Mr. Cripe, in his Supplemental Rebuttal Report (at 5-7) and GEICO actuary Stephen Riihimaki Deposition (at 62-75) provide descriptions of the rate setting process similar to that I have provided above. In their earlier statements, neither Mr. Cripe nor Mr. Riihimaki makes the claim that the derivation of the actuarial indication is the end of the story. Instead, each acknowledges the important role of business and competitive considerations in the pricing process. Mr. Cripe writes (Rebuttal Report, at 7-8):

> The resulting indicated rate level changes by coverage and in total are then reviewed by a business manager or group of business managers who will select the statewide rate changes

by coverage, taking into account such variables as rate

impact on existing policyholders, regulatory constraints,

competitive impacts, and current levels of profitability.

18. And Mr. Riihimaki concurs, describing a similar procedure (at 76 of
    his deposition).

19. Actuarial pricing methods, while leaving room for judgment, tend to the
    formulaic, especially in California, where as Mr. Cripe and Mr. Riihimaki agree,
    there are additional regulatory constraints on actuarial methods.  While that
    judgment is generally more likely to be exercised in decisions concerning overall
    rate level (those rates which would affect all insurance buyers) than concerning
    development of specific rating factors (those used to derive rates for individual
    consumers) it is limited in either case.  Rating factor calculations are controlled by
    a very specific sequential analysis procedure: the regulation requires insurers to
    consider the impact of factors in a prescribed order, and even sets a minimum
    value for the good driver discount.  Business considerations are not an input to
    any of these calculations, though actuaries may take business realities into
    account when applying actuarial judgment to the process.

20. No responsible insurer would blindly hand over the last word on its pricing
    decisions to a mechanically calculated indication devoid of any consideration of
    the business environment, and no insurer does so.  Each can be expected to
    evaluate its indicated rates using criteria that are not strictly actuarial.

21. But while Mr. Cripe, in his Rebuttal Report, acknowledges the role of business
    considerations in pricing, the models he develops in his Supplemental Rebuttal

Report ignore them and use premiums generated by actuarial formulas alone.  In contrast, Dr. Noll's models make use of the actual base rates and rating factors used by Allstate to price policies purchased by real policyholders residing and driving in California, rather than relying on hypothetical examples based on indicated rates.

### B. Only Dr. Noll's Models Can Detect Insurer's Exclusion of Savings from non-OEM Parts

22. Since only Dr. Noll's models use actual prices charged to consumers (i.e., prices that include the business adjustments described above), it follows that only Dr. Noll's models can be relied upon in evaluating the claim that insurer's savings from the use of non-OEM parts are not passed on to consumers.  Dr. Noll's models are the only ones that can detect whether the alleged conspiracy allowed an incomplete pass-through of savings to class members as a result of business adjustments to actuarially indicated rates.

23. Dr. Rubinfeld argues in his Supplemental Rebuttal Class Declaration that the EGR factor used by Allstate actuaries cannot change the level of pass-through. As long as the actuarial methods are applied formulaically to class members, using data as reported, they should produce an actuarial indication in which the rate that comes out accurately reflects the loss and premium data that goes in. The EGR factor, in particular, is essentially a zero-sum allocation of cost within a given vehicle group. But that begs the question of whether the rate to which the EGR factor is applied does or does not reflect full pass-through.

24. At the point of the business adjustments to the indications the mathematical rigor and relative formulaic security of the actuarial indication is set aside. Here is one

crucial point where any overcharge resulting from the conspiracy described in the Fourth Amended Complaint could be introduced.

25. Nonetheless, Mr. Cripe's models exclude any effects on rates or rating factors introduced by business adjustments, and so are useless in determining the presence or absence of savings from non-OEM parts in rates charged to consumers.

26. Dr. Rubinfeld makes the same mistake in his Supplemental Rebuttal Class Declaration, in which he spends a good deal of time discussing the derivation of Allstate's EGR factors and their use in ratemaking (*see*, ¶¶ 13-14, 18-20, 31-32). The essence of his position is that given the mechanical calculation of EGR by Allstate's actuaries, and their inclusion of actual losses in that calculation, "there is no room for less than complete pass-through of any of its component parts into customers' premiums." (at 5, ¶ 13).

27. This analysis, as well as Mr. Cripe's, misses the crucial ratemaking step at which business judgment is applied. Dr. Noll's models are not predicated on whether or not either rating factors or the data underlying them have been manipulated or misapplied.

28. Instead, Dr. Noll's models search for the pass-through of savings in the charged rate, after business judgment has been applied, and ask whether differences in savings from the use of the parts in this litigation can be seen in differences in the actual premium charged to class members. Because EGR is a point where the cost of parts can affect individual premiums, it made sense to test whether EGR was serving as a proxy for savings and Dr. Noll found that it is not. Dr. Rubinfeld

8

is correct to defend the integrity of the EGR factor and its application, but he turns away from recognizing the likelier source of any conspiracy to withhold non-OEM and salvage part savings from being shared with California consumers.

29. The Noll models, since they use final rates, include by definition any and every consideration included in the determination of those rates, regulatory, actuarial and business. Most importantly, they include the only likely stage of the ratemaking process at which the effect of any conspiracy could be reflected in the rates.

### C. Mr. Cripe's Regression Models Are Flawed

30. Mr. Cripe's regression models are irrelevant and flawed. Mr. Cripe points out (Supplemental Rebuttal Report at 2) that regression analysis "can lead to results that are utterly misleading if the regression analysis is not designed properly." The models he presents in his Supplemental Rebuttal Report convincingly demonstrate the truth of that assertion: they are improperly designed and as a result are misleading.

31. In his first model (at 8-10, Exhs. 1 and 1A), Mr. Cripe constructs a hypothetical insurer writing business in nine different EGR groups. Mr. Cripe has contrived the premium and loss data so that savings resulting from the use of non-OEM parts is, for every EGR group, precisely 10% of premium. He then uses the unsurprising fact that premium can be calculated as a function of these savings as an apparent refutation of Dr. Noll's Model 1. In fact, because real world data do not display so elegantly perfect a correlation between savings and losses, Mr. Cripe's results fall into the "utterly misleading" category he warned us against.

32. Mr. Cripe's second model fares little better. In an attempt to satisfy an imagined objection, he slightly tweaks the model, but continues to hold savings in a relatively narrow (but higher) range as a percentage of premium, still with a substantial positive correlation between savings and losses. Predictably, we get a regression result with a lower positive coefficient for savings, and Mr. Cripe again concludes that Noll Model 1 has been discredited. Once again he is wrong because his example does not model the real world relationship embodied in Dr. Noll's data.

33. The most complex of Mr. Cripe's regression models is relegated to an appendix of his report. It expands the rating universe of the Hypothetical Insurance Company to three rating variables: driver (good, bad, average), vehicle location (urban, rural suburban) and EGR (the same nine as in prior regressions). Mr. Cripe appears to believe that the added complexity of this model will overcome any objections to his earlier, clearly oversimplified models, but they do not. Not only does this model, by ignoring the final and crucial business adjustment phase of rate setting, share the fatal flaw of its companions, but its apparent complexity is misleading, too.

34. In fact, Mr. Cripe had no need to invent contrived examples using the Hypothetical Insurance Company's hypothetical results. The positive correlation he assumes, and then invents examples to "prove," is and remains testable using empirical data to which Mr. Cripe presumably has access. He chose not to perform such a test.

10

35. Dr. Noll's model, since it is drawn directly from the Allstate pricing algorithm, considers each of Allstate's 31 rating factors (some are not explicitly included in the model due to collinearity). Some of these factors contain dozens of possible values (the PGS category, which classifies the insured vehicle's price and the insured's deductible, has more than 300 possible values). I do not contend that any model's complexity is directly proportional to its accuracy; however, if the purpose of these models is to approximate the operation of a real insurance company's pricing algorithm, a model that actually uses that algorithm is a likelier candidate for success than one that reduces the number of possible classifications by more than 99%.

**D. Mr. Cripe's Analysis is Flawed in Other Respects**

36. In his Supplemental Rebuttal Report, under the heading **"ALLSTATE'S EXPERIENCE RATING GROUP (EGR) PROGRAM"** (at 5-7), Mr. Cripe presents a list of vehicle characteristics, which he correctly states will have an impact on the cost of insuring different vehicles. Among these are the high performance rating of a particular vehicle model (which he claims incur higher costs due at least in part to the types of drivers who buy them), horsepower-to-weight ratio, and braking system performance.

37. He ends the section (at 7) with a claim that Allstate reflects the cumulative impact of the listed features "and any other variables (e.g., theft rates, replacement vehicle costs for total losses, etc.) . . . in the combined effect of its Model Year, Utility Vehicle Discount, Price Group Symbol and Experience Rating Group (EGR) rating plans. Dr. Noll's four proposed methods focus solely on Allstate's

11

EGR program." Dr. Rubinfeld makes a similar claim in his Supplemental Rebuttal Class Declaration (at 4 n.11).

38. But in fact, the Model Year Rating algorithm applies identical rating factors to every vehicle from a given model year, regardless of any other attribute it may possess. It makes no attempt to differentiate among vehicles of the same model year as to their loss probabilities.

39. Similarly, the Price Group Symbol rating variable is derived solely from the vehicle's price (Rubinfeld Supplemental Rebuttal Class Declaration, at 6-7, ¶ 18), and the vehicle characteristics Cripe cites are not directly considered in its formulation.

40. So while Mr. Cripe criticizes Dr. Noll's reliance on the EGR variable in his regression models, Dr. Noll has in fact zeroed in on the single rating variable designed specifically by Allstate to capture loss variation among vehicle types.

41. On page two of his Supplemental Rebuttal Report, Mr. Cripe notes, "[a]ll four of Dr. Noll's methods show a lack of understanding of automobile insurance underwriting." Mr. Cripe's concern is irrelevant. The term "underwriting" is generally used to refer to the risk selection process. Dr. Noll's models take the marketing or risk selection practices of each insurer as is, and consider only the rate calculation process which takes place after all pricing and underwriting decisions have been made.

42. This is a strength of Dr. Noll's model, not, as Mr. Cripe contends, a weakness. Were Dr. Noll's models to have incorporated aspects of the risk selection process,

their details would vary from company to company and generally over time as California insurers evolved and modified their risk selection practices.

43. Because the impact of underwriting considerations is built into the models they are easily adaptable to the risk factors used by any insurance carrier. As Mr. Cripe points out, the template for the models is simply a reproduction of Allstate's rate calculation process, using the risk characteristics of actual consumers and the filed and approved base rates and rating factors of the insurer. Nothing outside the rate calculation process itself enters the basic model. Far from being a problem, this allows the model to estimate whether savings were passed on.

**E. Much of Mr. Cripe's Rebuttal Report Is Irrelevant, Based on My Understanding of Plaintiffs' Claim**

44. My understanding of the Plaintiffs' claim in this case is that California insurance buyers have been overcharged for automobile insurance coverage due to a failure by insurers to pass through savings they enjoyed as a result of their use of non-OEM and salvage parts to repair covered vehicles. As I understand it, the extent of use of non-OEM and salvage parts is not directly relevant to that claim. The extent of damages suffered by California insurance buyers is simply the difference between the premium they paid and the premium they would have paid had the pass-through been complete. Dr. Rubinfeld comes close to expressing this in portions of paragraphs 42 and 43 (at 16) of his Supplemental Rebuttal Class Declaration.

45. If this understanding is correct, much of Mr. Cripe's Rebuttal Report misses the point entirely. Beginning on page 20, he discusses three distinct areas in which he sees Dr. Noll's models as deficient.

13

46. The first is the interaction of used car prices and total losses with other cost components. Even if Mr. Cripe's analysis demonstrated the relationship he expects, the results of Dr. Noll's models, which depend solely on the rates as charged by the insurer, are affected by the cost relationships Mr. Cripe describes only to the extent they are already reflected in the rates, and in a way that does not change if the alleged misconduct had not occurred.

47. Next, Mr. Cripe attempts to convince us that Dr. Noll's models are discredited by actuaries' inability to correctly project future loss costs. Unless the actuaries systematically err in one direction, these misestimates will have no measurable overall impact on the results of Dr. Noll's models.

48. Finally, Mr. Cripe discusses the impact that changes on interest rates or expense levels might have on premium. Obviously, changes in these quantities are reflected in rate filings as they occur, and will have an impact on rates charged to California insurance buyers. And when rates do change as a result of expense or interest rate effects, these rate changes will be reflected in Dr. Noll's models, which use the base rates and rating factors actually used to calculate premiums, and contain no other inputs. But based on my understanding of Plaintiffs' claims, nothing in this case would cause any such changes to occur and so interest rates and expense levels would be effectively unchanged between the actual results and the results that would have ensued if the alleged misconduct had not occurred.

49. These criticisms from Mr. Cripe literally have nothing to do with the damage calculation produced by Dr. Noll's models, and should be ignored.

14

# SIGNATURE PAGE

I declare the foregoing is true to the best of my knowledge and belief. Executed at Watertown, Massachusetts, August 13, 2011.

Donald T. Bashline

**Bashline Exhibit 1**

ALLSTATE INSURANCE COMPANY AND ALLSTATE INDEMNITY COMPANY

Exhibit 20
Page 7

CALIFORNIA

AUTOMOBILE INSURANCE – VOLUNTARY PRIVATE PASSENGER CARS
Determination of Statewide Rate Level Change

Fiscal Accident Year Ending December 31, 2001

UNINSURED MOTORIST

|  | Dec-1999 0% | Dec-2000 2% | Dec-2001 98% |  |
|---|---|---|---|---|
| 1) Earned Car Years | 1,458,040 | 1,590,136 | 1,721,634 | |
| 2) Earned Premium @ Present Rates | $57,119,594 | $60,134,090 | $67,587,149 | |
| 3) Average Premium @ Present Rates [(2)/(1)] | $39.18 | $37.82 | $39.26 | $39.23 |
| 4) Premium Projection Factor | 1.000 | 1.000 | 1.000 | |
| 5) Projected Average Earned Premium @ Present Rates [(3) x (4)] | $39.18 | $37.82 | $39.26 | $39.23 |
| 6) Incurred Loss and Loss Adjustment Expense (Includes Loss Development) | $43,809,726 | $56,691,519 | $62,972,453 | |
| 7) Average Incurred Loss and Loss Adjustment Expense [(6)/(1)] | $30.05 | $35.65 | $36.58 | |
| 8) Factor to Adjust for Subsequent Change in Loss Cost | 1.178 | 1.132 | 1.089 | |
| 9) Average Loss and Loss Adjustment Expenses [(7) x (8)] | $35.39 | $40.37 | $39.83 | $39.84 |
| 10) Proposed General and Other Acquisition Expenses | | | | $0.00 |
| 11) Proposed General and Other Acquisition Expenses [(10) x Inflation factor] | | | | $0.00 |
| 12) Provision for Commissions, Taxes and Profit (Ratio) | | | | 23.4% |
| 13) Provision for Ancillary Income (Ratio) | | | | 1.3% |
| 14) Total Needed Average Premium [(9) + (11)]/[1.0 - ((12)-(13))] | | | | $51.14 |
| 15) Indicated Rate Level Change [(14)/(5)] - 1.0 | | | | 30.4% |

ALLSTATE 0001138 (Rates)

# APPENDIX A: BASHLINE CURRICULUM VITAE

**DONALD BASHLINE, FCAS, FCIA, MAAA**
38 Carver Road East
Watertown, MA 02472
617-923-2855
dbashline@gmail.com

**PROFESSIONAL
AFFILIATIONS:**

Fellow, Casualty Actuarial Society, 1982
Fellow, Canadian Institute of Actuaries, 1990
Member, American Academy of Actuaries, 1980
Served on CAS Examination, Syllabus, and Textbook Steering Committees
Served on AAA Committee on Property-Liability Issues

**EXPERIENCE**

**8/03 – Present**

BASHLINE AND ASSOCIATES, Watertown, MA
<u>Independent Consultant</u>
Clients include:
- ProMutual Insurance Group
- Lynch, Ryan Associates
- Pilgrim Insurance Company
- John Hancock Insurance

**12/99 – 8/03**

WORKERS' COMPENSATION RATING AND INSPECTION BUREAU OF MA, Boston, MA
<u>Actuary</u>
- Directed the preparation of rate reviews and filings for Workers' Compensation for consideration by the Actuarial Committee and other Bureau committees.
- Managed six-person actuarial department.
- Prepared position papers and support documents to filings for review by the Actuarial Committee and Bureau Counsel.
- Gave expert testimony at Insurance Department hearings.
- Assisted bureau counsel on actuarial/statistical matters in hearing preparations and rebuttal.
- Assisted in the planning and prepared agenda items and minutes for Actuarial Committee meetings.
- Represented the Bureau at meetings with the Insurance Department, industry committees, and other bureaus.
- Directed the preparation of new statistical plans and other data call specifications for ratemaking purposes.
- Coordinated technical and actuarial research.
- Directed the preparation of responses to inquiries and requests for technical assistance and information from the Insurance Department, publications, and other outside individuals and organizations.
- Assisted the President in the administration of personnel policies.

**4/91 – 12/99**

BASHLINE AND ASSOCIATES, Philadelphia, PA and Watertown, MA
<u>Independent Consultant</u>
Major clients included:
- Massachusetts State Rating Bureau (1992 & 1999 workers' compensation rate hearings, evaluation of workers' compensation and other rate filings, evaluation of 1991 reform legislation);
- California Department of Insurance (served on Commissioner Garamendi's workers' compensation hearing panels 1992-1994, and worked on no-fault and pay-at-the-pump legislation);
- Lynch, Ryan & Associates (helped develop Massachusetts QLMP program);
- Arbella Indemnity Insurance Company (helped organize and operate Arbella Indemnity's workers' compensation program);

• Florida Public Advocate (testified at workers' compensation rate hearing in 1993).

**DONALD BASHLINE**
**PAGE TWO**

| | |
|---|---|
| 1/90 – 4/91 | RELIANCE REINSURANCE CORPORATION, Philadelphia, PA |

1/90 – 4/91
RELIANCE REINSURANCE CORPORATION, Philadelphia, PA
Vice President and Actuary
• Was responsible for pricing new reinsurance programs, setting reserves and evaluating rate adequacy on existing contracts.

10/89 – 1/90
BASHLINE AND ASSOCIATES, Philadelphia, PA
Independent Consultant
• Clients included Texas State Senate (evaluation of proposed workers' compensation legislation).

4/89 – 10/89
MASSACHUSETTS STATE RATING BUREAU, Boston, MA
Director
• Managed section of 17 professional and support personnel.
• Was responsible for all rate and form filings in Massachusetts.
• Was responsible for making personal auto and workers' compensation filings on behalf of the Bureau.

4/87 – 4/89
MASSACHUSETTS DIVISION OF INSURANCE, Boston, MA
Consulting Actuary
• Provided technical assistance to hearing officer during 1987 workers' compensation hearing, and co-wrote rate decision.
• Provided technical assistance for Credit Insurance Reform Act passed during 1988.
• Assisted in development of 1988 Auto Insurance Reform Act.
• Served as actuarial advisor to Director of Medical Malpractice Analysis Bureau.
• Helped develop new Safe Driver Insurance Plan.

8/86 – 4/87
MASSACHUSETTS STATE RATING BUREAU, Boston, MA
Actuary
• Provided expert testimony at hearing to set 1987 personal automobile insurance rates.
• Helped to develop guidelines for processing of rate filings.

7/80 – 9/86
LIBERTY MUTUAL INSURANCE COMPANY, Boston, MA
Actuary
• Worked in Commercial Auto area.

2/77 – 7/80
HOME INSURANCE COMPANY, New York, NY
Actuarial Student
• Worked in Commercial Property, General Liability and Workers' Compensation areas.

**EDUCATION:**
B.A. in Mathematics, C. W. Post College
Graduate study in Mathematics, St. John's University

# APPENDIX B: LIST OF DOCUMENTS CONSIDERED

**Legal**

1. Declaration of Frederick F. Cripe (April 20, 2001)

2. Fourth Amended Complaint (July 6, 2011)

3. Preliminary Class Declaration of Roger G. Noll (Mar. 11, 2011)

4. Supplemental Rebuttal Class Declaration of Daniel L. Rubinfeld (Aug. 5, 2011)

5. Supplemental Rebuttal Report of Frederick F. Cripe (Aug. 4, 2011)

6. Supplemental Class Declaration of Roger G, Noll (July 6, 2011)

7. Rebuttal Report of Frederick F. Cripe (Mar. 25, 2011)

8. Deposition of Stephen Riihimaki, Vol. 1 (July 13, 2011)

**Rate Filings**

9. ALLSTATE 0000976 – ALLSTATE 0001136

EXHIBIT 35

Exhibit 35 is an extract of the deposition of Daniel Rubinfeld, Defendants' economic expert, marked by Defendants "Highly Confidential" under the Protective Order in this action.  Plaintiffs will seek leave to file this portion of the transcript under seal, should the Defendants so require.

EXHIBIT 36

## DECLARATION OF TOM JOHNSTON

I, Tom Johnston, hereby declare as follow:

1.      I am the manager of Bertolli's Auto Body Shop, Inc. ("Bertolli's"), located at 1345 E. Francisco Blvd, San Rafael, CA 94901. This declaration is based upon my own personal knowledge. If called as a witness to testify to the matters asserted herein, I could and would testify thereto.

2.      Bertolli's has been in the auto repair business in California since 1977.

3.      I have been the manager of Bertolli's for approximately one year. In my role as manager, I am involved in all phases of the repair process. Among other things, I inspect vehicles that come in for repair; prepare estimates; work directly with insurance adjusters who come to our shop to inspect vehicles and prepare estimates for vehicles insured by their companies; oversee the repair itself; and communicate directly with customers regarding estimates and repairs on their vehicles.

4.      I have over twenty-five years of experience in the automotive repair industry.

5.      On average, Bertolli's repairs approximately seventy-five automobiles per month.

6.      Bertolli's does not participate in any Direct Repair Programs ("DRPs") with any insurance company, nor does Bertolli's have any other provider or service agreements in place with any insurance company. However, Bertolli's does conduct repairs for insured vehicles, and I therefore routinely deal with automobile insurance companies, including State Farm Mutual Automobile Insurance Co. ("State Farm") and Liberty Mutual Fire Insurance Co. ("Liberty Mutual").

7.      One of the primary reasons Bertolli's has chosen not to participate in any DRPs with insurance providers, including State Farm and Liberty Mutual, is that Bertolli's is not willing to agree to use inferior repair parts, including new non-OEM or aftermarket parts, on vehicles that Bertolli's repairs. It is my understanding that State Farm and Liberty Mutual often require body shops in their DRP programs to use low-quality new non-OEM or aftermarket parts, as well as salvaged or recycled parts.

8.     I am aware that State Farm and Liberty Mutual may try to steer repair business away from Bertolli's because they are aware that Bertolli's may refuse to use new non-OEM or aftermarket parts.

## REPAIR PARTS

9.     I am familiar with the different types of repair parts that may be used to repair an automobile, including original equipment manufactured ("OEM") parts, new non-OEM or aftermarket parts, and salvaged or recycled parts.

10.    New non-OEM or aftermarket parts used in body shop repairs may include, among other parts, sheet metal parts, windshields, radiators, AC condensers, headlamps, and bumper parts.

11.    The most significant differences between OEM and new non-OEM or aftermarket parts is the quality, kind, fit, safety, finish, and corrosion resistance of the parts. New non-OEM or aftermarket parts are inferior in quality, fit, and finish to new OEM parts, and as a result, often compromise the crash resistance and safety of vehicles.

12.    Salvaged or recycled parts may also include, among other parts, radiators, AC condensers, headlamps, and bumper parts.

13.    CAPA is an industry organization that certifies some new non-OEM or aftermarket parts. It is my understanding that CAPA is owned and controlled by insurance companies. CAPA stickers appear on the certified parts. Not all new non-OEM repair parts are CAPA-certified.

14.    State Farm and Liberty Mutual sometimes include new non-OEM or aftermarket parts that CAPA does not certify on their estimates for repairs that Bertolli's performs.

## GENERATING REPAIR ESTIMATES

15.    When a vehicle insured by State Farm or Liberty Mutual is brought into Bertolli's for a repair, an estimate must be generated for that repair. Bertolli's generates its own estimate using an automated estimate system known as CCC. Bertolli's includes new OEM parts on its estimates because it believes new non-OEM or aftermarket parts, and salvaged or recycled parts are inferior. However, for vehicles insured by State Farm or Liberty Mutual, those insurance companies require that one of their own adjusters come to Bertolli's to inspect the vehicle and generate their

own estimate. It is my understanding that the adjusters for State Farm and Liberty Mutual also use an electronic estimation system to generate their estimates.

16.     State Farm and Liberty Mutual require that the estimate generated by their adjuster, rather than the estimate that Bertolli's generates, for the repair. Their estimates specify the type of repair parts that must be used on the repair, and often specify new non-OEM or aftermarket parts. They also often include salvaged or recycled parts.

17.     The types of new non-OEM or aftermarket parts that the estimates generated by State Farm and Liberty Mutual specify include, among others, new non-OEM or aftermarket sheet metal parts, radiators, windshields, AC condensers, bumper parts, headlamps, and front-end parts.

18.     For repairs on vehicles insured by State Farm or Liberty Mutual, Bertolli's cannot begin repairs on the vehicle until State Farm or Liberty Mutual has approved the type of repair parts that we plan to use on the repair.

19.     The customer must also approve the estimate. Generally, the adjuster, or another individual from State Farm or Liberty Mutual will call the customer to communicate the total dollar amount of the estimate to the customer. It is my understanding that State Farm and Liberty Mutual routinely do not communicate to the customer the types of repair parts (including new non-OEM or aftermarket parts, and salvaged or recycled parts) that the estimate specifies. The customer, for example, may not be told that State Farm or Liberty Mutual is only willing to pay for new non-OEM or aftermarket parts as opposed to new OEM parts.

20.     When Bertolli's calls customers (which we always do) to go over the estimate, we always inform the customer if State Farm or Liberty Mutual has specified that new non-OEM or aftermarket parts, or salvaged or recycled parts must be used on their repair. We also inform the customer that those parts are not of like kind, quality, and fit as OEM parts.

21.     In certain cases, the State Farm or Liberty Mutual estimate may specify a new non-OEM or aftermarket part, or a salvaged or recycled part for a repair, but the customer may instead wish to use a new OEM part because the customer knows new OEM parts are of better quality and fit. In

those cases, the customer is almost always required to pay the difference in price for the OEM part out-of-pocket.

## LOCATING REPAIR PARTS

22.     The estimates that State Farm and Liberty Mutual generate also specify where Bertolli's must source the parts from.  For new non-OEM or aftermarket parts, the estimate will generally provide Bertolli's with three or four suppliers that State Farm or Liberty Mutual claims have the new non-OEM or aftermarket part specified on the estimate.  From my experience, the supplier they specify often does not, in fact, have the new non-OEM or aftermarket part specified on the estimate.  In those cases, we have to follow up with State Farm or Liberty Mutual to have them provide another supplier, which adds additional time to the repair process.

23.     In addition, the supplier that the State Farm or Liberty Mutual estimate specifies may often be located across the country or not have the part available immediately, in which case obtaining the new non-OEM or aftermarket part may take substantial time.

24.     For salvaged or recycled parts, the State Farm or Liberty Mutual estimate almost always specifies that we source the parts from LKQ.  LKQ stands for "Like Kind and Quality," and, to my knowledge, is owned or controlled by insurance companies.

25.     Even if our repair team concludes that we are able to obtain a higher-quality repair part through a supplier other than LKQ, or that we are able to obtain an equal or higher-quality repair part from another supplier more quickly, State Farm and Liberty Mutual often will not allow us to obtain the part from that supplier.  We must obtain the part from the LKQ supplier specified in their estimate.

## NEW NON-OEM OR AFTERMARKET PARTS

26.     Based on my experience using new non-OEM or aftermarket parts on vehicle repairs, they are not of like kind, quality, fit, safety, finish, or corrosion resistance as new OEM parts.

27.     New non-OEM or aftermarket parts are generally inadequate to restore a damaged vehicle to pre-loss condition relative to function and appearance because the parts often do not fit properly.  In many cases, when a new non-OEM or aftermarket part arrives at our shop, we spend

substantial time and labor (for which we are not compensated by State Farm or Liberty Mutual) trying to fit the part onto a vehicle, only to have to send the part back and order another one because it simply will not fit, or will not fit without substantially compromising the quality and safety of the vehicle.

28.     In those cases where an insurance company such as State Farm or Liberty Mutual insists that we use a new non-OEM or aftermarket part, we are often forced to drill larger holes in the part to make it fit on the vehicle.  That process compromises the rust-proof quality of the vehicle since only the area surrounding the original hole in the part is rust-proofed by the original manufacturer.

29.     The negative consequences of using a low-quality new non-OEM or aftermarket part on a vehicle repair can be significant.  In addition to fit, new non-OEM or aftermarket parts could have problems with thickness, length, width, size and location of welds, type of metal or material used, and many other factors that make them inferior.

30.     Radiators, for example, vary widely in quality.  A low-quality radiator could cause a car to overheat, compromising the safety of the vehicle for the driver.  Based on my experience, only 40% of the new non-OEM or aftermarket radiators that we receive for installation actually function and fit properly.

31.     Based on my experience, the fact that a new non-OEM or aftermarket part is CAPA certified does not make it more likely that the part is of like kind, quality, fit, and safety as a new OEM part.

## SALVAGED OR RECYCLED PARTS

32.     State Farm and Liberty Mutual also encourages Bertolli's to use salvaged or recycled parts rather than OEM parts.

33.     At the direction of State Farm and Liberty Mutual, almost all of those salvaged or recycled parts come from LKQ.

34.     Like new non-OEM or aftermarket parts, the quality of salvaged or recycled parts can vary widely.  In order to ensure that we are using high-quality salvaged or recycled parts, our repair team uses a MIL Gauge on the parts to ensure that they have not been overused and that they are

of high quality and will not compromise the structural integrity or safety of the vehicle being repaired.

I am over eighteen years of age.  I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.

Executed on July 27, 2011, in San Rafael, California.

_____
TOM JOHNSTON
Manager, Bertolli's Auto Body Shop, Inc.

# EXHIBIT 37

## DECLARATION OF CARA WATERS

I, Cara Waters, hereby declare as follow:

1.    I am the general manager of EuroCal Auto Body ("EuroCal"), which is located at 345 West College Avenue, Santa Rosa, CA, 95401. This declaration is based upon my own personal knowledge. If called as a witness to testify to the matters asserted herein, I could and would testify thereto.

2.    EuroCal has been in the auto repair business in California since 1970.

3.    I have been the general manager at EuroCal for thirteen years. In my role as manager, I am involved in all phases of the repair process. Among other things, I inspect vehicles that come in for repair; prepare estimates; locate and order repair parts; work directly with insurance adjusters who come to our shop to inspect vehicles and prepare estimates for vehicles insured by their companies; oversee the repair itself; and communicate directly with customers regarding estimates and repairs on their vehicles.

4.    I have over twenty-six years of experience in the automotive repair industry.

5.    On average, EuroCal repairs approximately forty vehicles per month.

6.    EuroCal does not currently participate in any Direct Repair Programs ("DRPs") with any insurance company, including State Farm Mutual Automobile Insurance Co. ("State Farm") and Liberty Mutual Fire Insurance Co. ("Liberty Mutual"), nor does EuroCal currently have any other provider or service agreements in place with any insurance company. However, during the period from at least 1998, when I first began working at EuroCal, through 2006, EuroCal was a participant in State Farm's DRP program. One of the primary reasons EuroCal decided, in 2006, to no longer participate in State Farm or any other insurance provider's DRP is that EuroCal was and is not willing to agree to use inferior repair parts on vehicles that EuroCal repairs. Based on my experience as a participant in State Farm's DRP, State Farm often requires body shops participating in their DRP programs to use inferior, low-quality parts, which may include new non-OEM or aftermarket parts, or salvaged or recycled parts.

7.      Although EuroCal is not a participant in any DRP, EuroCal does conduct repairs for insured vehicles, and I therefore routinely deal with automobile insurance companies, including State Farm and Liberty Mutual.  Approximately twenty percent of the repairs we conduct during any given month are repairs on State Farm or Liberty Mutual-insured vehicles.

## REPAIR PARTS

8.      I am familiar with the different types of repair parts that may be used to repair an automobile, including original equipment manufactured ("OEM") parts, new non-OEM or aftermarket parts, and salvaged or recycled parts.  Salvaged parts may also include reconditioned or refurbished parts that have been pulled off of wrecked vehicles.

9.      New non-OEM or aftermarket parts used in body shop repairs may include, among other parts, sheet metal parts, windshields, radiators, AC condensers, headlamps, hoods, fenders, bumper parts, and front-end parts.

10.      The most significant differences between OEM and new non-OEM or aftermarket parts is the quality, kind, fit, safety, finish, and corrosion resistance of the parts.  New non-OEM or aftermarket parts are inferior in quality, fit, and finish to new OEM parts, and as a result, often compromise the structural integrity, mechanical integrity, and safety of vehicles.

11.      Salvaged or recycled parts may include, among other parts, sheet metal, radiators, AC condensers, headlamps, hoods, fenders, bumper parts, and front-end parts.

12.      CAPA is an industry organization that certifies some new non-OEM or aftermarket parts.  CAPA stickers appear on the certified parts, but not all new non-OEM or aftermarket repair parts are CAPA-certified.

13.      Liberty Mutual sometimes includes new non-OEM or aftermarket parts that CAPA does not certify on its estimates for repairs that EuroCal performs.

## GENERATING REPAIR ESTIMATES

14.      When a vehicle insured by State Farm or Liberty Mutual is brought into EuroCal for a repair, an estimate must be generated for that repair.  EuroCal generates its own estimate using an automated estimate system known as CCC Pathways.  EuroCal includes new OEM parts on its

estimates because it believes new non-OEM or aftermarket parts, and salvaged or recycled parts are inferior. However, for vehicles insured by State Farm or Liberty Mutual, those insurance companies require that one of their own adjusters come to EuroCal to inspect the vehicle and generate their own estimate. It is my understanding that the adjusters for State Farm and Liberty Mutual also use electronic estimation systems to generate their estimates. It is my understanding that State Farm's adjusters use a system called Mitchell, and that Liberty Mutual's adjusters use a system called ADP.

15.     State Farm and Liberty Mutual require that the estimate generated by their adjuster, rather than the estimate that EuroCal generates, be used for the repair. Their estimates specify the type of repair parts that must be used on the repair, including new non-OEM or aftermarket parts, and salvaged or recycled parts.

16.     State Farm's estimates almost always specify that only salvaged or recycled parts may be used. However, for radiators and radiator condensers, State Farm's estimates may specify that new non-OEM or aftermarket parts be used. The only instances in which State Farm's estimates may specify new OEM parts are for repairs on vehicles with fewer than 1,000 miles. Vehicles brought into our shop for repair rarely, if ever, have fewer than 1,000 miles on them.

17.     Liberty Mutual's estimates almost always specify that new non-OEM or aftermarket parts be used for repairs. If those new non-OEM or aftermarket parts are not available, the adjuster may allow the estimate to be supplemented to specify that salvaged or recycled parts may be used instead. Only in the rare circumstance that a vehicle brought into EuroCal for repair has fewer than 1,000 miles on it will Liberty Mutual allow new OEM parts to be included on an estimate.

18.     The types of new non-OEM or aftermarket parts that estimates generated by State Farm specify include radiators and radiator condensers. The types of new non-OEM or aftermarket parts that estimates generated by Liberty Mutual often specify include, among others, new non-OEM or aftermarket sheet metal parts, windshields, radiators, AC condensers, headlamps, fenders, bumper parts, and front-end parts.

19.     The types of salvaged or recycled parts that estimates generated by State Farm and Liberty Mutual often specify also include, among others, salvaged or recycled sheet metal parts, windshields, radiators, AC condensers, headlamps, fenders, bumper parts, and front-end parts.

20.     For repairs on vehicles insured by State Farm or Liberty Mutual, EuroCal cannot begin repairs on the vehicle until State Farm or Liberty Mutual has approved the type of repair parts that we plan to use on the repair.

21.     The customer must also approve the estimate.  Generally, the adjuster or another individual from State Farm or Liberty Mutual will call the customer to communicate the total dollar amount of the estimate to the customer.  It is my understanding that State Farm and Liberty Mutual generally do not communicate to the customer the types of repair parts (including new non-OEM or aftermarket parts, and salvaged or recycled parts) that the estimate specifies.  Although the written estimate may include certain "codes" indicating the type of part to be used on the repair, such as "AM" for aftermarket parts or "REC" for reconditions parts, customers generally are not familiar with what those codes mean.  State Farm and Liberty Mutual also do not tell customers about the vast differences in quality, fit, and safety that exist between new non-OEM or aftermarket parts, or salvaged or recycled parts, and new OEM parts.

22.     When EuroCal calls customers (which we always do) to go over the estimate, we always inform the customer if State Farm or Liberty Mutual has specified that new non-OEM or aftermarket parts, or salvaged or recycled parts must be used on their repair.  We also explain to the customer that those parts are not of like kind, quality, and fit as OEM parts.

23.     In certain cases, a State Farm or Liberty Mutual estimate may specify a new non-OEM or aftermarket part, or a salvaged or recycled part for a repair, but the customer may instead wish to use a new OEM part because the customer knows that new OEM parts are of better quality and fit. In those cases, the customer is almost always required to pay the difference in price for the OEM part out-of-pocket.

## LOCATING REPAIR PARTS

24.     Once an estimate for a particular repair is generated, the parts for the repair must then be located.  For repairs for State Farm or Liberty Mutual-insured vehicles, the automated estimation system that those companies use (either Mitchell or ADP) specifies where our body shop must source the repair parts specified on the estimate from.  For new non-OEM or aftermarket parts, the estimate will generally provide EuroCal with a specific supplier that State Farm or Liberty Mutual claims has the new non-OEM or aftermarket part specified on the estimate.  From my experience, the supplier they specify often does not, in fact, have the new non-OEM or aftermarket part specified on the estimate.  In those cases, we have to follow up with State Farm or Liberty Mutual to have them provide another supplier, which adds additional time to the repair process.

25.     In addition, the supplier that the State Farm or Liberty Mutual estimate specifies may often be located across the country or not have the part available immediately, in which case obtaining the new non-OEM or aftermarket part may take substantial time.

26.     For salvaged or recycled parts, the estimates State Farm or Liberty Mutual generate almost always specify that we source the parts from LKQ.  LKQ stands for "Like Kind and Quality," and, to my knowledge, is owned or controlled by insurance companies.  It is my understanding that when we call LKQ for a particular salvaged or recycled part, LKQ uses their own locator system to locate a junk yard around the country that has the type of part requested.

27.     Even if our repair team concludes that we are able to obtain a higher-quality repair part through a supplier other than LKQ, or that we are able to obtain an equal or higher-quality repair part from another supplier more quickly, State Farm and Liberty Mutual often will not allow us to obtain the part from that supplier.  We must obtain the part from the LKQ supplier specified in their estimate.

## NEW NON-OEM OR AFTERMARKET PARTS

28.     Based on my experience using new non-OEM or aftermarket parts on vehicle repairs, they are not of like kind, quality, fit, safety, finish, or corrosion resistance as new OEM parts. Specifically, new non-OEM or aftermarket parts are generally inadequate to restore a damaged

vehicle to pre-loss condition relative to function and appearance because the parts often do not fit properly.

29.     In many cases, when a new non-OEM or aftermarket part arrives at our shop, we spend substantial time and labor (for which we are not compensated by State Farm or Liberty Mutual) trying to fit the part onto a vehicle, only to have to send the part back and order another one because it simply will not fit, or will not fit without substantially compromising the quality and safety of the vehicle.

30.     In those cases where an insurance company such as Liberty Mutual insists that we use a new non-OEM or aftermarket part, we are often forced, for example, to drill larger holes in the part to make it fit on the vehicle. That process compromises the structural and mechanical integrity of the vehicle.

31.     The negative consequences of using a low-quality new non-OEM or aftermarket part on a vehicle repair can be significant. In addition to fit, new non-OEM or aftermarket parts could have problems with thickness, length, width, size and location of welds, type of metal or material used, and many other factors that make them inferior.

32.     Front-end parts, for example, vary widely in quality. A low-quality front-end part can compromise the structural integrity of the vehicle and can turn a minor collision into a major collision for drivers.

33.     Based on my experience, the fact that a new non-OEM or aftermarket part is CAPA certified does not make it more likely that the part is of like kind, quality, fit, and safety as a new OEM part.

## SALVAGED OR RECYCLED PARTS

34.     State Farm and Liberty Mutual also often require that our body shop use salvaged or recycled parts, especially refurbished or reconditioned parts, on repairs for vehicles insured by State Farm and Liberty Mutual. State Farm's estimates almost always specify that only salvaged or recycled parts may be used, as do Liberty Mutual's estimates when new non-OEM or aftermarket parts are not available.

35.     At the direction of both State Farm and Liberty Mutual, nearly all of those salvaged or recycled parts come from LKQ.

36.     Like new non-OEM or aftermarket parts, the quality of salvaged or recycled parts can vary widely. Because salvaged or recycled parts have been previously used on other vehicles (many of which were severely damaged or totaled in collisions) and were typically not made for the specific type of vehicle being repaired, matching, fitting, and installing salvaged or recycled parts usually takes more time and effort than it would if a new OEM part was used. State Farm and Liberty Mutual do not compensate us for that additional time and labor. Often times, we are forced to send the part back to LKQ because it simply will not fit on the vehicle without compromising the safety and integrity of the vehicle.

37.     The negative consequences of installing an inferior salvaged or recycled part on a vehicle can be devastating. State Farm has, on occasion, required that we use salvaged or recycled suspension parts on a vehicle. High-quality suspension parts that fit and work properly are essential to the proper operation and safety of a vehicle. Many times, at the direction of State Farm or Liberty Mutual, we have installed a salvaged or recycled suspension part, but when we send the vehicle to an alignment shop (which we always do) to inspect the installed suspension parts, the alignment shop confirms that the parts do not fit and cannot be used without compromising the integrity and safety of the vehicle. In those cases, we simply refuse to use the salvaged or recycled suspension parts, even though we have already expended time and resources installing them.

38.     State Farm's adjusters, in particular, are insistent that we use salvaged or recycled parts, and not new non-OEM parts, even at the expense of compromising the vehicle's integrity and safety. In at least one instance, after our repair team determined that the rear panels on a particular vehicle needed to be replaced because they were bent, the State Farm adjuster asked us to simply put the bumper back on the vehicle and not actually replace the damaged rear panels. The adjuster said that the customer likely would never notice that the rear panels had not been replaced, even

though the customer had specifically seen the bent rear panels and concluded that they must be replaced.

39.   Because the salvaged or recycled parts that LKQ sends to us usually do not contain any information with them indicating what type of vehicle the part came from, how many miles were on the vehicle, or what type of crash the vehicle may have been in, for many parts, including suspension parts, we specifically ask LKQ for that information.  We do so in order to ensure that we do not install inferior parts that may compromise the integrity or safety of the vehicle.

40.   . Another type of salvaged or recycled part that State Farm sometimes pressures us to use is salvaged or recycled quarter panels, which are among the most important parts on vehicles in terms of their structural integrity and safety.  Replacing a quarter panel involves cutting the existing quarter panel off of a vehicle and replacing it with a new one.  A salvaged or recycled quarter panel that often times has come off of a crashed vehicle not only usually does not fit properly, but also compromises the integrity and safety of the vehicle.


I am over eighteen years of age.  I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.  Executed on September 22, 2011, at Santa Rosa, California.

                                                    CARA WATERS
                                          General Manager, EuroCal Auto Body

# EXHIBIT 38



Expert • Independent • Nonprofit

News Only  ·  **Search**

Home > News > Cars > Manufacturer > Ford

**Top Product Ratings:** Tires | Sedans | SUVs | Small Cars | GPS

**News** | **Cars**   🔊 Subscribe to Cars Feed                    More Consumer News

| More

FORD

## Tests show aftermarket replacement parts can present safety risk

Jul 22, 2010 1:02 PM

If your car was repaired with cheap bumper replacement parts not made by the original automaker, your air bag may not deploy as expected if you get into another crash, according to computer-simulated crash tests conducted by Ford.



"The air bag may deploy earlier than it should. Or it may deploy when it shouldn't or not deploy at all when it should," says Mike Warwood, Ford's parts marketing and remanufacturing manager.

For this study, Ford engineers compared factory-installed bumper beams, bumper isolators, bumper brackets, and radiator supports against non-Ford, aftermarket replacement pieces, looking at the 2005-2009 Mustang and 2004-2007 F-150.



The bumper beam, which lies unseen beneath the decorative plastic bumper cover, plays a critical role in auto safety. In a frontal crash, the bumper beam is the first structural part to suffer the impact and initiate vibrations through the vehicle body. Those vibrations are ultimately picked up by sensors, which determine whether the air bag should be deployed or not, and how quickly.

In the Mustang comparison, the original Ford bumper beam was a one-piece beam made of ultra-high-strength steel. The aftermarket copy was made up of two pieces of so-called mild steel spot-welded together. "Differences in material will result in a difference in the timing of the air bag deployment," says Warwood.

David Zuby, chief research officer for the Insurance Institute for Highway Safety (IIHS), agrees. "The vehicle structure is part of a complex system designed to protect people in crashes, as well as hold up the engine. There's a lot of engineering that goes into making a crash protection system. You can't willy nilly change those parts, because the system won't work the way it was designed," says Zuby.

The IIHS, a research group funded by the insurance industry, has not crash-tested aftermarket bumpers, frame rails, or other safety related parts. However, it does not advocate their use, because there is no system in place to guarantee that they would perform the same way the original parts would in a crash. "There's too much unknown to recommend them," says Zuby.

Ford examined the original and imitation structural radiator support for the F-150 pickup. Ford's original support was made of magnesium. The non-Ford copy was made of molded plastic with a sheet-metal rib pop-riveted to it. This part raised red flags with Ford engineers because one of the vehicle's air bag sensors is mounted to the hood latch support bracket which is mounted to the radiator support.

Finally, the parts were scanned and plugged into computer models of the Mustang and F-150, along with their materials properties. Those models are used to computer-simulate crash tests at 8, 12, 25, and 35 mph.

Engineers found that the non-Ford crash parts performed differently than the original Ford parts and produced a shift in timing that would affect air bag deployment. How deployment might change remained unclear without actual physical crash tests, says Paul Massie, Ford's powertrain and collision product marketing manager. Warwood says Ford is now considering conducting real crash testing on aftermarket bumpers.

The Ford test results, while limited to only two aftermarket component sets, are important, because they credibly demonstrate that replacing the original automaker's safety related parts with cheap knockoffs may increase the

risk of injury to vehicle occupants in a subsequent crash. While Ford shared these findings, the lesson may apply to all vehicles where safety-related replacement parts are not sourced from the automaker.

—Jeff Blyskal

 Internet Explorer cannot display the webpage

More About: Cars | Ford | **All Cars News**

## Post a comment

Sign in to comment

## Comments: 6                                    **Collapse All**

**jason miller**
December 13, 2010 10:20 PM

This must be read by shop owners or anyone has a car to know the safety risk of their car parts.

**brian**
August 2, 2010 9:54 PM

Couldn't a shift in the airbag deployment be due to the installation? It seems to me that there are a lot of factors in whether or not the systems work properly after a collision and repair takes place. One consideration is the quality and expertise in the repair industry.

**Steve**
August 2, 2010 8:02 PM

Another key thing that this article does not mention is that Ford had their own problems with airbags prematurely discharging on the Ford F150.

**Bob G**
July 26, 2010 10:16 AM

The one thing that this article does not mention is Ford does have a licensing agreement with Companies that sell aftermarket parts. This article also forgot to mention that Ford takes a percentage of every part sold contained with in that agreement.

So it seems Ford wants it both ways. Make money off of aftermarket parts and campaign to regain their monopoly of replacement parts.

**Rene**
July 23, 2010 2:34 PM

Key phrase to the lack of action on these parts that have been SPECIFIED on insurance estimates for years and years much to the chagrin of "some" collision repairers would be this: "The IIHS, a research group funded by the insurance industry"..... NUFF SAID!

**Barrett/FI**
July 23  2010 12 39 PM

I would strongly encourage every shop owner to read this carefully, post it in your reception areas and provide copies for your employees and customers.

You should also provide a copy to your corporate legal counsel and Garage Keepers Insurance agent and ask them for their legal position (in writing) regarding any and all liabilities associated and incurred with your company using non-original parts in the repairs you perform and have this information available for insurers and your customers.

Ask if there are any liability waivers, releases, or hold harmless agreements available for your customers to sign if they themselves want the use of such parts used, and if there are...use them consistently and let me know so I can share them with others.

For those who participate in Direct Repair Programs, have your legal counsel look over the agreements to see if the liabilities are shared with the insurer or if you and your shop incur all associated liabilities.

The collision industry is rife with unavoidable liabilities that, at any time, could cost you your business, your livelihood, your life's savings and your good name....one must ask themself: why accept a liability which is easily avoidable?

Regards!

Barrett

# EXHIBIT 39



**Certified Automotive Parts Association**
**Washington, D.C.**

July 28, 2010

Mr. Charlie Hogarty                           Ms. Dolores Richardson, President
Chairman, Board of Directors                  Auto Body Parts Association
Auto Body Parts Association                    10700 Henri Bourassa East
2589 N. Mountain Avenue                        Montreal, Quebec H1C 1G9
Claremont, CA 91711                            CANADA

**An Open Letter to ABPA Members on Their Decision to Endorse and Fund a Part**
**Certification Program Which Promises to Increase Market Share and Profits for**
**Distributors and Manufacturers but Makes No Mention of Standards or**
**Requirements**

Dear Mr. Hogarty and Ms. Richardson:

The news release (April 20, 2010 "NSF Certification") posted on the website of
one of your members and published in the May-June Issue of Body Language, reports
that the Auto Body Parts Association has endorsed and agreed to fund a part
"certification" program. Key aspects of the program, according to the release, include:

- Dramatic reduction of certification costs for manufacturers;
- Warranting the certification process;
- Allowing parts to be stamped "NSF" at no cost;
- Collaboration with insurers on how much the program will cost; and,
- Assurance of greater market share and profits for manufacturers and distributors.

In commenting on the release, ABPA executive director confirmed their "interest
[in the program] to NSF" and further stated that ABPA is considering all options
pertaining to product certification, product affirmation and "any and all other programs
which might lead to a greater level of acceptance of our products and services." While
the executive director said that the release was incorrect in saying that ABPA would
fund the entire program, he did not disclose who else was funding the program or how
much ABPA was contributing to the program.

There was no clarification by the ABPA in the Body Language which published
the release, nor in the subsequent issue. The release, published in Body Language[1], raises

---

[1] To the best of our knowledge, Body Language, a publication of the ABPA, is the only publication who
has chosen to publish this release announcing ABPA's endorsement of the program.

PEREZ053632

**Open Letter to U.S. Crash Part Distributors**                                    **page 2**

some very serious concerns for anyone interested in <u>legitimate</u> quality certification standards.

While announcing ABPA endorsement of the program, the release only mentions one ABPA member, namely LKQ. Inexplicably, the release states that the National Sanitation Foundation has the "trust of LKQ," (ABPA's largest member) due to "[NSF] having managed the AQRP[2] program" and "[NSF] supporting the sale of Taiwanese products for LKQ." It is unclear how the National Sanitation Foundation is supporting the sale of Taiwanese products for LKQ.

Over the years, ABPA members have chosen not to insist that their suppliers provide parts that meet CAPA's comprehensive part quality requirements even though these manufacturers have proven time and again that they can meet the standards. Now, as the safety and quality of the parts they sell comes under intense scrutiny, the ABPA has chosen to endorse a set of standards that are unknown to the public, unknown to the manufacturers, unknown to collision repairers, and apparently, unknown even to members of the ABPA. Nevertheless, they are recommending that these unknown standards be applied to sheet metal, lighting, plastic bumpers and grilles, and high strength steel products. In fact, the release states that "the program plans to include any and all parts delivered to the automobile industry in the U.S." Two of the product categories that they are endorsing unknown standards for have serious safety implications: lights and structural bumpers.

Fully endorsing unknown standards as a way to increase market share is a potentially dangerous position to take in this era of heightened sensitivity to part safety and quality concerns. The market is filled with examples of what can happen when sales and profits out rank quality and safety concerns—flying hoods, unsafe bumpers, and lights failing FMVSS requirements.

**ABPA Endorsed Program is said to Increase Profits and Reduce Cost of Certification**

Called a "seminal moment for our industry," the release states that this ABPA endorsed program will "assuredly begin a constant rise of market share and greater profits," even though the largest part distributor in the U.S., has already been reporting record profits and sales during its last series of quarterly earnings reports.

In addition to increasing sales and profits, the second theme of the release is reducing the cost of certification for manufacturers. Certification costs are based on two

---

[2] LKQ was an active participant in the now defunct MQVP program which was the precursor to their AQRP program. AQRP is a proprietary program controlled solely by one ABPA member.

PEREZ053633

Case 5:06-cv-01962-LHK   Document 512   Filed 09/26/11   Page 46 of 91

components: the cost of developing and enforcing the certification standards and the cost of manufacturing parts to comply with the standards.

## Implications of "Low Cost" Quality Certification Programs

While this program "allows for parts to be stamped 'NSF' at no cost," manufacturers throughout the world pay for the certification of their products. By making such an investment, manufacturers are demonstrating belief in the tenants of the program and see value in being recognized for meeting the standards. History has shown that if there is no financial investment by a manufacturer, there is little reason to comply with the requirements of the program.

Another way to reduce the cost of certification is to reduce the requirements and make it easier to comply. Each year CAPA spends millions of dollars testing, retesting, inspecting, and monitoring certified parts. While CAPA could easily make it "cheaper" for manufacturers to meet the standards, that would be failing our public duty as an independent, third party standard setting and certification organization. In light of the increasing scrutiny on parts, does the ABPA believe that consumers, collision repairers and insurers need a low-cost program that hasn't determined (or disclosed) how it will address quality and safety issues, but promises increased profits for manufacturers and distributors?

## How Have Insurers "Collaborated" on "Cost Effective Standards"?

A key question raised in the release is exactly how have insurers "collaborated" with the program on the "cost effective" nature of the standards? What have insurers and the sponsor collaborated on to insure that the standards don't cost too much? Are the standards based on their ability to identify high quality parts or their cost to implement? In today's environment it would seem that both the ABPA and "collaborating" insurers are taking a big risk with standards based on their cost to implement. And who are these "collaborating" insurers?

At CAPA, the quality of the program has always taken precedence. CAPA's insistence on detailed material testing, precise, repeatable vehicle test fit procedures, testing to insure compliance with FMVSS, extensive in-factory inspections, specific requirements for checking fixtures and many other unique features of CAPA's publically available standards have required significant investments by CAPA and the manufacturers choosing to meet the standards. On the other hand, ABPA members have direct experience in the outcome where these investments are not made. Non-galvanized parts, bumpers so weak they can easily be cut, energy absorbers that literally explode in low-speed collisions, hoods with weak latching mechanisms, lights that don't meet FMVSS requirements, and parts that simply don't fit. The tragedy is that all of these problems exist in today's market because manufacturers and distributors were looking for "cost effective" products. While the ABPA, "collaborating insurers" and the National

PEREZ053634

**Open Letter to U.S. Crash Part Distributors**                                     **page 4**

Sanitation Foundation may believe that "cost effective" standards will sell parts, "cost effective" standards don't protect consumers.

## How Do Certification Entities Warrant Certification?

Another issue raised by the announcement of the ABPA support of this program relates to the warranting of the certification program. Warranties are typically between buyers and sellers, who is the buyer and who is the seller? What consideration will be given when the warranty is invoked? What, exactly, is being warranted? Are the parts being warranted by the certifier?

## Important Questions about Program Funding

The press release in ABPA's Body Language indicates that ABPA plans to "fund (or partially fund as was later stated) the development of all standards for the crash part market, including sheet metal, lighting, plastic bumpers and grilles, and high strength steel products." The funding of such a program is of significant concern, especially considering that ABPA is now saying that it will only "partially" fund the program while allowing manufacturers to stamp their products "NSF" for free.

Legitimate, independent effective standards require a considerable investment to develop, implement, and enforce. CAPA has invested tens of millions of dollars in the testing, experimentation, research and compliance requirements necessary to develop and effectively implement a truly legitimate and independent set of standards. In fact, CAPA stepped in to make this investment when the ABPA acknowledged that funding a legitimate program was beyond its means. Over the years the ABPA has cut back its meetings, publications and activities due to funding challenges.

In light of the promise of "no cost" certification to manufacturers, either ABPA members have access to significant undisclosed funding, or they plan to apply their "cost effective" mantra to whatever standard it is that they've endorsed. The bottom line: While "cheap" standards may produce cheap (albeit profitable for distributor) parts, they don't insure confidence or quality. These are two factors that have historically been missing from the non-CAPA Certified products of ABPA members.

## Is This a Good Time to Be Promoting "Cost Effective" Standards?

It is apparent that this is not a good time for an industry that has historically struggled with its quality image to focus on "cost effective" standards. In fact, just recently the California Department of Insurance reminded insurers of their obligation to provide parts of like, kind and quality. As the U.S. Congress takes a serious look at whether or not car companies should have the right to patent their parts, the car companies and body shops are raising the issue of aftermarket part quality. ABPA's

PEREZ053635

endorsement and financial support for an unknown and "cost effective" set of "standards" could go a long way to reinforce those concerns among members of Congress.

Recently, Ford has gained national attention for its release of studies showing substandard aftermarket parts and other car companies are expected to follow suit. CAPA, itself provided ABPA with evidence of a seriously defective bumper absorber with dramatic comparative crash test footage[3]. Shortly, CAPA will be releasing other information on non-certified part quality and safety. All of this points to the growing concern in the market about quality and safety and the need for legitimate, independent standards for true product comparability.

As ABPA members know, CAPA is an independent, third-party standard setting and certification program that has survived intense scrutiny because its standards are well founded, legitimate and effective. Furthermore, manufacturers who participate in the program have clearly demonstrated that they can fully comply with these legitimate standards. Instead of simply recommending that its members insist on high quality CAPA Certified parts, ABPA's decision to endorse unknown, "cost effective" "standards" is not likely to instill confidence in a category of products already reeling from quality and safety concerns.

### Will the Promise of "Greater Profits" Address Marketplace Quality Concerns?

CAPA's founding principles, standards and goals have resulted in an unparalleled record of quality and safety for its certified parts. In contrast, the program being endorsed and funded by the ABPA has as its underlying motive a substantial expansion of market share for aftermarket crash parts and "greater profits for all manufacturers and distributors." Apparently, these are the outcomes that will result from "acceptable cost-effective standards" developed through "collaboration" between NSF and certain unnamed U.S. insurance companies.

---

[3] In comparative testing done during the development of CAPA 501: Bumper Parts Standard, we tested the bumper energy absorber for a Ford Fusion 06-09. Both the car company brand and independent parts were marked PC-PBT plastic and looked remarkably similar. In CAPA's dynamic testing process (6.1 mph crash test into a fixed barrier) the AM part literally exploded on impact. The car company brand part absorbed the force of the impact and returned to its original shape. In subsequent material tests required by CAPA, we determined that material used in the AM part was totally different than the car company brand part material even though the manufacturer marked it as the same type of plastic. There were no manufacturer markings on the part, but the distributor selling the part was notified of the problem on June 7, 2010. In addition, the dramatic comparative video was shown at the April 30, 2010 meeting of the Auto Body Parts Association which included most major part distributors. Neither the selling distributor, nor the part distributors viewing the video, have contacted CAPA for more information or taken any known action regarding the part.

PEREZ053636

**Open Letter to U.S. Crash Part Distributors**                                **page 6**

This APBA endorsed program appears to be an attempt to provide manufacturers and their distributors with a low-cost alternative to legitimate certification that could amount to no more than window dressing for substandard and unsafe body parts. While this may be acceptable to ABPA members, I, and the members of CAPA's Board of Directors, find this development to be deeply troubling.

**ABPA Principals Who Know CAPA Appear to Be Recommending Bottom Line Benefits over Legitimate Quality Certification**

CAPA is the nation's only independent, non-profit, third-party crash parts quality certification organization whose sole purpose is to insure that both consumers and the industry can identify high quality parts. Over the past two decades, this legitimate and effective certification program has gained a prominent role in the aftermarket parts market and is frequently cited by insurers, legislators, leading collision repairers, and others for the rigorous impartiality with which our program is conducted. As a member of CAPA's Technical Committee, the ABPA's President, Charlie Hogarty, is certainly aware of the comprehensive standards that CAPA imposes upon manufacturers as a requirement of certification. Ironically, ABPA's largest member, LKQ, had this to say about CAPA in its December 2009 Form 10-K submission to the SEC:

> "Many major insurance companies have adopted policies recommending or requiring the use when available of the approximately 3,000 parts certified by CAPA. A number of CAPA certified parts are also marketed under the Platinum Plus [LKQ aftermarket product line] brand . . . We distribute parts certified by CAPA and actively participate with CAPA, insurance companies and consumer groups in encouraging independent manufacturers of collision replacement products to seek CAPA certification."

While LKQ tells its stockholders that CAPA quality is important, the release for the ABPA/LKQ endorsed program asserts that *"Past certifications have failed to move AM market share beyond current levels for the past two decades."* Evidently, then, the new National Sanitation Foundation program is being driven by a desire for greater use of aftermarket parts that have <u>not</u> achieved CAPA Certification and the resulting profits to be made by distributors. <u>Based upon our many years of legitimate quality certification experience, sacrificing quality and safety, in a rush to bottom line profits, is a recipe for disaster.</u>

Over 23 years ago the ABPA saw the need for true, part quality certification. Since that time tens of millions of dollars have been dedicated to developing an unparalleled program. It is clear that if the ABPA was truly interested in providing the market with high quality parts, they would simply take advantage of the independent, legitimate, standards embodied in the CAPA program and suggest that their members accept nothing less. There are 39 manufacturers worldwide that can <u>easily</u> meet this level of quality, if asked.

PEREZ053637

**Open Letter to U.S. Crash Part Distributors**                               page 7

Given the increasing scrutiny that is expected over the next few years on alternative parts, endorsing and funding an unknown set of "standards" designed to be "cost effective" and "increase market share" is an incredibly risky proposition. Rather than lead the industry to profitability and success through higher quality, the ABPA is endorsing a dilution of quality under the guise of "cost effective" standards. Given the expected increase in the public, regulatory, and legal scrutiny of crash part quality and safety, this seems to be a giant step backward that will only further tarnish the industry's already challenged reputation.

What is particularly tragic about ABPA's endorsement of unknown and "cost effective standards" is that the ABPA has access to a truly legitimate, time tested, accepted, and functional set of quality standards that could easily take their industry to great heights. Instead, they are lowering their standards in an effort to increase profits and market share. Unfortunately, history books are filled with examples of what happens when an industry takes a "blind-eye" to quality in the search for increased profits.

Sincerely,

Jack Gillis
Executive Director

cc: CAPA Board of Directors
    CAPA Distributor Members
    CAPA Distributor Mailing List
    Stan Rodman, ABPA Executive Director
    Debbie Klouser, CAPA Director of Operations

PEREZ053638

AUTOMOTIVE BODY PARTS ASSOCIATION : OFFICIAL HOME OF ABPA® ASS...   Page 1 of 2

**HOME**
**ASSOCIATION**
**MEMBERSHIP**
**EVENTS**
**PUBLICATIONS**
**PARTSLINK**
**LINKS**

RELATED LINKS

CAPA Open Letter To ABPA
Members
NSF Response To CAPA Letter
Chairman's Response (Full
Text)  Jack Gillis

## FROM THE OFFICE OF THE CHAIRMAN

AN OPEN LETTER TO JACK GILLIS OF THE CERTIFIED AUTOMOTIVE PARTS ASSOCIATION IN RESPONSE
TO HIS JULY 28TH LETTER OF ATTACK ON ABPA AND ITS BOARD OF DIRECTORS

CLAREMONT, CA—August 2, 2010

Mr. Jack Gillis
Executive Director, CAPA
1000 Vermont Ave., NW, Suite 1010
Washington, DC 20005

In reading your widely-circulated letter, I am particularly disappointed by your
claims and accusations about the intentions and motivations of ABPA to study the
feasibility of a new certifying agency for alternative replacement crash parts.

Your lengthy letter is full of inaccuracies and false conclusions based almost
entirely on comments made by an individual who has never been a board
member or in any way involved with ABPA policies.

We are well aware of the vested stake you have in CAPA's success and we recognize that few have
worked harder than you and your staff to bring about a greater level of quality and acceptance of
aftermarket crash parts. I can also understand the sense of abandonment you must have felt when you
heard about our intent to explore additional options in this arena.

I am not going to take the time to list the shortcomings of the CAPA program as we see them. We have
discussed them with you on many occasions. Nor do I choose to even address your criticisms point by
point. To us, it is obvious that after the expenditure of millions of dollars, CAPA is not working as well
as it should when considering the small percentage of parts in the marketplace carrying the CAPA seal.
We, therefore, set up a special committee to study the problem. The Board ultimately agreed that other
avenues should be explored to determine if there were a better way to reach our objective of increasing
the number of OE equivalent certified parts available to our members.

Having already established ties to NSF International through our efforts to develop a "distributor
certification," we were presented with an opportunity to explore avenues relating to "product
certification." At no time were we told nor did the Board profess to desire a dummied-down program
which would cheapen the parts or compromise quality and industry standards for safety, appearance
and performance. We want parts that are comparable to the OE products they are designed to replace
and we were led to believe that this is doable under a well-constructed, well-managed and more
efficiently operated program than we believe CAPA to be.

You may feel good in castigating our efforts to this end and disparaging our desire to increase market
share at what you term a "sacrifice in quality," and you may feel good in firing off this widely-circulated
broadside, but your observations are skewed and your conclusions erroneous. If and when NSF
International feels it has arrived at product standards comparable to OE parts, and if and when this
Association is presented with a program which encompasses our objectives, only then will we feel
justified in making a decision as to which way to proceed. If this means backing an additional
certification program, despite your protestations, then that will be our decision. From day one of our
deliberations, our goal has been to achieve a greater availability of certified parts based on the

http://www.autobpa.com/news-08-2010-01.html

PEREZ053639

establishment of like, kind and quality standards comparable to OE parts.

Ironically, Jack, none of this precludes our members or this Association from continuing its long standing backing of CAPA in its efforts. We even, as has been our custom, invited you to speak to our members at our annual convention in Indianapolis at the end of April. That is because we have never seen this as an "either or" proposition. And despite your propensity for shooting from the lip with this widely-circulated and very damaging letter of allegations, we are not as upset with you as you appear to be with us. We do, however, wish you had not derided NSF as "sanitation people." It was a name they left in 1990, more than two decades ago. So, we judge this was just a cheap shot and I can only guess that you are not aware that today NSF International is one of the leading certifying organizations in the world with thousands of automotive clients.

One of the primary messages of our industry has always been that "competition is a good thing," and we feel that this applies to the certification of auto crash parts. Rather than venting your frustration at ABPA and what actions we may or may not take, we recommend that you spend your energies to enhance the efficiencies of your own program so that it can compete with other certifiers which may enter this field in the future.

Sincerely yours,



CHARLIE HOGARTY
Chairman, ABPA
Claremont, CA 91711

http://www.autobpa.com/news-08-2010-01.html

08/09/2010

PEREZ053640

HOME
ASSOCIATION
MEMBERSHIP
EVENTS
PUBLICATIONS
PARTSLINK
LINKS

RELATED LINKS

CAPA Open Letter To ABPA
Members
ABPA Response To CAPA Letter

## NSF RESPONSE TO CAPA OPEN LETTER

NSF ATTEMPTS TO CLARIFY THEIR HISTORY, MISSION AND POSITION IN AUTOMOTIVE PART
CERTIFICATION.

 **NSF International Automotive Business Solutions**

ANN ARBOR, MI—August 4, 2010

Mr. Charlie Hogarty, Chairman
Board of Directors
Auto Body Parts Association

Ms. Dolores Richardson, President
Board of Directors
Auto Body Parts Association

Dear Ms. Richardson and Mr. Hogarty,

I read the letter sent to ABPA on July 28th by Mr. Jack Gillis of CAPA and feel it is important to clarify
NSF International's long history in the world of certification, its mission, and its position in the
automotive market. Mr. Gillis appears to be unaware of NSF's position in these areas and CAPA has
certainly misrepresented NSF to ABPA, the body shops, distributors and insurers.

NSF has a history that dates to 1944 with the development of the first food equipment standards as well
as the world's first food equipment certification program. Today, this NSF program continues to be
recognized as the standard by which every country in the world measures their programs, and it is
recognized by every major food equipment manufacturer, restaurant and health official in the US. This
first has been followed by many more firsts in a wide arena of markets with high risks and serious
concerns for human health and safety, including: pools, plumbing products, pharmaceuticals, water
treatment, and automotive structural parts. NSF's mission is to protect public health and safety, and
NSF has been and will continue to be a leader in the development of standards and product and system
certification programs that fulfill that mission.

In February of this year, NSF announced the first certification program for front steel bumpers, rear step
bumpers, reinforcement bars, absorbers and brackets. This was an industry first, developed to meet
the needs of a market that is being seriously harmed by low quality, low performing and potentially
unsafe parts. This work came at the request of and in conjunction with concerned members of the
automotive aftermarket industry. Just last week, the first automotive parts were certified under this
program with many more expected to follow. For the first time, body shops, distributors and insurers will
have safe alternatives to original equipment (OE) service parts that are clearly identified with the NSF
mark.

With the almost daily reports of continued problems with low quality parts in the automotive aftermarket,
the need for a new approach to a growing problem is evident. Looking at NSF's success at developing
world-class standards coupled with cost-effective certification programs for other markets and their
almost universal acceptance, NSF brings unparalleled expertise to the automotive aftermarket parts
market. The development of an NSF automotive parts certification program based on the offering of

PEREZ053641

alternative, quality replacement parts that are of like kind and quality to OE service parts promises consumers, body shops and distributors high quality, safe parts that are clearly identified with the NSF mark.

NSF's certification criteria require the highest level of performance in terms of form, fit and function, as well as the production facility's quality systems. Specific requirements include:

On-site inspection and approval of the manufacturing facilities' production and quality system.

In-plant part quality assurance requirements.

Rigorous part testing to ensure the highest levels of performance.

Comparison to OE service parts across dimensional and material attributes.

Ongoing monitoring of certified parts.

Random, in-market part testing.

An ongoing process for monitoring and taking action regarding customer complaints.

A traceability requirement that allows for an effective recall process.

NSF International has over 65-years of experience in certification, testing and inspection and extensive expertise in automotive, providing the confidence in which the collision repair industry can rely. NSF's standards development process is ANSI accredited and NSF's testing laboratories are ISO 17025 accredited. NSF is the third largest registrar of automotive manufacturers in the world (4,100 + certificates) and one of the first registrars to be recognized by the International Automotive Task Force (IATF) to conduct audits to ISO/TS 16949. As a world leader in quality and environmental management systems registrations, NSF has certified automotive auditors across the globe.

The NSF Mark is recognized for its value in international trade around the world and is respected by regulatory agencies at the local, state, and federal levels. NSF has approximately 900 employees, operates in over 120 countries, and certifies more than 275,000 products worldwide.

If you have any questions about NSF's certification program, please contact me. Additional information also is available at www.nsfautomotive.com.

Sincerely,


Robert W. Frayer Jr., PE

08/09/2010

PEREZ053642

EXHIBIT 40

**Certified Automotive Parts Association**
Washington, D.C.

August 26, 1996

Mr. Tom L'Hote
Vice President -Auto Claims
State Farm Insurance Co.
One State Farm Plaza
Bloomington, IL 61710-0001

Dear Mr. L'Hote,

Thanks to your support, CAPA has weathered the storms of its first 8.5 years and is in the midst of its best year ever. Manufacturers continue to join the program and submit parts for certification. We now have over 1500 certified parts -- more than ever before. Manufacturer projections indicate that we will have 1700 parts by the end of 1996.

All CAPA Manufacturers will be packaging their products in specially designated "CAPA Certified" boxes by January, 1997. CAPA's 9 Total Quality Manufacturers (CTQMs) have been using this distinctive packaging since 1995 and it has made these CAPA parts easily identifiable in distributor warehouses and collision repair shops. The unilateral use of this packaging coincides with our efforts in increased CAPA visibility.

CAPA's continuing inter-industry efforts have resulted in significant changes in the attitudes held by leaders in the collision repair industry. Many now believe that a healthy CAPA is important to the future of their industry.

In an effort to educate the industry and consumers about CAPA, and to clearly differentiate between certified parts and non-certified parts, CAPA has produced three educational videos. (You have received information about these videos under separate cover.) Member insurance companies are being encouraged to reproduce and distribute the videos to their claims staff, collision repair shops and policy holders. The videos are aimed at these three groups and were produced in response to suggestions from the CAPA Marketing Committee made up of insurance company marketing and public relations executives.

Now that we have completed the final steps in the technical development of the program, we have begun an internal restructuring designed to assure efficient and cost effective program management in light of the various program changes. Two elements of the restructuring include shifting the Complaint Handling and Recall Programs from the Validator into CAPA headquarters.

CAPA seal sale revenues continue to rise, though not at a pace which would allow CAPA to become self-sufficient in the near future. We expect $1.3 million in seal revenues in 1996. This

Suite 306/1518 K Street, NW/20005

**CONFIDENTIAL**

202-737-2212/202-737-2214

11883

revenue, which is dictated solely by demand, represents about 40% of the operating budget necessary to run this dynamic and growing program. The 1997 budget will be affected by increased certification activity, enhanced promotion to the collision repair industry and efforts to prevent further local anti-aftermarket part legislative initiatives. We will be soliciting approximately $2.7 million from the insurance industry to cover our 1997 budget. Your contribution will enable CAPA to stay active throughout the year, continuing the valuable work started in 1987, as well as taking on new challenges.

With the goal of lowering future insurance company contributions, CAPA is raising the *Good or Bad?* seal charge from $0.50 to $0.75 as of January, 1997. The effect of raising the seal price will depend on market demand for CAPA parts. If there is adequate demand, insurance company contributions necessary for maintaining CAPA should go down in 1998.

Strong anti-aftermarket part sentiment continues to rear its head in state legislatures (Rhode Island, Florida and New Jersey) and among local collision repair associations. CAPA has provided background information and written testimony to help battle these anti-competition\anti-consumer initiatives, which appear to be funded by car companies. If successful, they will cost insurers and consumers more money and result in increased friction costs throughout the collision repair industry. The best protection from this type of legislation is to fully support CAPA, not only by offering financial support, but by assuring that your policy holders actually get CAPA certified parts when you call for them.

These accomplishments are the good news. CAPA's future, however, is based solely on the market demand for CAPA certified parts. While manufacturers are making a commitment to CAPA certification, strong market demand for CAPA parts has yet to be realized. Although many part distributors say they are trying to make CAPA parts available to their customers, there are reported incidents of distributors ordering less expensive, non-certified applications. This indicates that there is still a strong market among collision repair shops for non-certified parts.

Compliance to our revised standards, which better ensure consistently high quality parts, is expensive. Each manufacturer looks at compliance to CAPA standards as a business decision. Like you, as business people, they need to weigh the expense and return of their decisions. Manufacturers have raised questions about the wisdom of full compliance to CAPA's new standards. They are concerned that the U.S. market has shown little demand for a fairly priced, consistently high quality alternative to car company parts. Therefore, as a supporter of CAPA, the most important thing your company can do is develop the means to send a strong marketplace message to the manufacturers that there is a market for fairly priced CAPA certified parts.

Our plans for 1997 are to continue the work begun in 1996, including:

continuing to certify as many high quality parts as manufacturers submit;

enhancing CAPA's name recognition in the collision repair industry;

CONFIDENTIAL

TET 072347

11884

improving inter-industry understanding about the consequences to CAPA of each company's marketplace behavior;

ensuring full compliance to CAPA's revised Quality Standards Manual;

increasing the number of CAPA approved manufacturers;

initiating a long term strategic planning process; and,

establishing CAPA in the European market.

Remember that every year you contribute to CAPA, the use of non-car company parts saves the insurance industry an estimated $400 million in direct savings and an additional $400 million in indirect savings, due to price reductions of car company parts. Legislative initiatives, like those mentioned above, adversely affect increased market share of CAPA parts and threaten CAPA's future. Since CAPA is your best defense against questionable quality, non-certified aftermarket parts, your continued support is invaluable.

We have enclosed your 1997 membership fee and invoice. This fee, based on your company's 1995 total earned premium according to AM Best, will be $468,870.00. Although we have not changed the solicitation formula for 1997, your fee may have fluctuated based on a change in your 1995 earned premium, which AM Best reports as $8,479,000,359.00. Please note that your payment is not due until January 31, 1997. However, as CAPA has no reserves (in order to keep assessments low), we would appreciate your payment in advance of the due date if possible.

Your choice to continue supporting CAPA in 1997 will benefit State Farm Insurance Company, its policy holders and all American consumers. We appreciate your support in the past, and look forward to our continued alliance.

Sincerely,

Jack Gillis
Executive Director

Enclosure (1997 Invoice)

CONFIDENTIAL

TET 072348
3/24/98

C - 11885

EXHIBIT 41

Start of Item 2.

Message.
Subject: CAPA                                    Dated: 10/15/93 at 1020.
Sender: John R KENT / HOME/09
CC: Bill HARDT / HOME/09                          Contents: 2.

Part 1.

FROM: John R KENT / HOME/09

TO: Thomas J HEINEMANN / HOME/09
    Vincent J LOFFREDO / HOME/09

CC: Bill HARDT / HOME/09

Part 2.

TO:  TOM HEINEMANN
     VINCE LOFFREDO

FR:  JOHN KENT

RE:  CAPA

RECENT AND AGE OLD PROBLEMS REGARDING NON-OEM PARTS THAT ARE BEING RELATED
TO CAPA PARTS:

1.  CAPA CERTIFIED PART IS WRITTEN, HOWEVER, THE DISTRIBUTOR DOES NOT
    HAVE THE PART...EVEN THOUGH THE AUTOMATED ESTIMATING SYSTEM INDICATES
    THE PART AS AVAILABLE.

2.  QUALITY AND FIT OF NON-OEM PARTS (CAPA) CONTINUE TO PRESENT A PROBLEM.
    EXAMPLE: RANGER - BRONCO II HOODS - THE LOCKING PLATE HAS A "COLD WELD"
    AND WILL NOT HOLD.  DISTRIBUTOR ADVISED PART DECERTIFIED, THEN
    RECERTIFIED WITHOUT CORRECTIONS BEING MADE.  THIS IS AN OBVIOUS SAFTEY
    PROBLEM.

3.  PLASTIC PARTS, SPECIFICALLY GRILLES, SIDE MOLDING, AND HEADLIGHT BEASLES
    DO NOT "MIRROR" O.E.M. QUALITY FOR CHROMING AND FIT APPLICATIONS.

4.  NON-OEM PARKING LAMPS, SIDE MARKERS AND CORNING LAMP LENSES, AMBER IN
    COLOR, ARE NOT THE SAME COLOR AS O.E.M. PARTS.

5.  NON-OEM BUMPERS COVERS AND FACIAS DO NOT MEET THE QUALITY FOR FIT
    EQUAL TO O.E.M.

6.  THE ADP SYSTEM LOCATES THE LEAST COSTLY NON-OEM PART SCANNED, AND PRINTS
    THAT AMOUNT.  THE REPAIRERS ARE CALLING FOR PARTS PRICE INCREASES ON
    THE NON-OEM PARTS PRICED IN OUR ADP ESTIMATES.  THE UPDATING OF THE
    NON-OEM PART PRICES PROVIDED BY ADP NEEDS TO BE ADDRESSED.

7.  THE DISTRIBUTOR AGREES TO WARRANT DEFECTIVE PARTS AND TO PAY THE
    REPAIRER FOR REASONABLE AND NECESSARY LABOR COST.  THE PART MANUFACTURER
    WARRANTS ONLY THE DEFECTIVE PART WITH NO CONSIDERATION FOR LABOR
    CHARGES.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

TN013422

TET 002491
1-14-98

SFM GILC00032933
Highly Confidential - Attorneys' Eyes Only

THE ITEMS LISTED ABOVE ARE SOME OF THE CONCERNS BEING PRESENTED BY MY REGIONS.

WHAT ARE YOU HEARING FROM YOUR AREAS.  I AM BEING TOLD THAT THE QUALITY ISSUE
IS SIGNIFICANT AND IS RECEIVING NEGATIVE "FEEDBACK" FROM REPAIRERS AND
CUSTOMERS.

I AM TOLD THAT WE ARE ADDRESSING OUR CONCERNS WITH THE APPROPRIATE PARTIES...
THE DISTRIBUTORS AND THE AUTOMATED ESTIMATING VENDORS.

End of Item 2.

TN013423

**CONFIDENTIAL**
SUBJECT TO PROTECTIVE ORDER

TET 002482
1-14-98

SFM GILC00032934
Highly Confidential - Attorneys' Eyes Only

# Exhibit 42


Internet Explorer cannot display the webpage

✓ Register / Log In


**SearchAutoParts**.com

Home / Advertise / Subscribe / About Us / RSS

*Find it here!*    🔍 Search-AutoParts Articles    Automotive sites    **Search**

Community    Find Parts    Supplier Finder    Jobs    Collision Repair    Service Repair    Distribution    Technicians    Global Events

## COLLISION REPAIR  POWERED BY  ABRN **CLICK HERE**

# SCRS cautions repairers about safety of structural replacement parts

Publish date: Jan 30, 2010

Email | Print | Share | Save | License 

SOURCE

**ABRN** 

Share This Page:

Send    Share


Internet Explorer cannot display the w     Internet Explo

What you can try:

Diagnose Connection Problems    Diagnose C

More information    More infor

The Society of Collision Repair Specialists (SCRS) is recommending that collision repairers use extreme caution when sourcing replacement parts in a vehicle's crash protection system, including bumper reinforcement beams, bumper brackets, bumper energy absorbers, bumpers and radiator core supports.

SCRS said repairers need to make sure to only use parts that will perform with the same expectation of quality and safety, both upon installation, and for the life of the vehicle. SCRS also recommends that repair facilities understand the liability associated with the utilization of inferior parts, and to avoid being unduly influenced to utilize any replacement part that has not undergone credible independent testing to ensure it meets quality and safety based standards.

"This issue is concerning on so many levels," says SCRS Aaron Schulenburg, SCRS executive director. "Obviously our members have to understand the liability implications they have when making critical repair decisions such as part selection. The problem with many of these parts is that a visual inspection at the shop level often can't uncover significant differences, like material or alloy variances. We can't visually see the difference in weight, or that one part is .25mm thinner than another; especially when the two aren't side by side for comparison. It should also not be the responsibility of the shop to make a determination on which part is equivalent, or not. If it is not quality, if it is not safe, it shouldn't even make its way to the market; but they are. We have too many examples, even with current internal 'quality assurance programs' in place, that they are being manufactured, sold, and utilized, despite not meeting the most basic of requirements such as material composition."


Internet Explorer cannot display the webpage

SCRS statement comes following two demonstrations by veteran I-CAR trainer Toby Chess at Collision Industry Conference meetings in November and January. Chess, who also is the SCRS national director and education committee member, outlined comparative studies he had conducted between randomly selected OEM and aftermarket structural replacement parts. The parts reviewed included items such as front and rear bumper reinforcement beams, radiator core supports, bumper brackets and bumper energy absorbers.

In every example tested, there were significant differences in both the construction of, and materials used, in the aftermarket replacement part, which can significantly impact the roles that these parts serve in the transfer of energy resulting from a collision. Each of these parts also directly relates to the functionality and response of the vehicle safety restraint system (SRS), and could have a resulting affect on how the airbag functions in the event of a loss. The presentation also detailed that in other instances where the manufacturer had paid particular attention to utilizing the same materials as the OEM, and employed credible third-party testing, the parts appeared to perform much better in subsequent crash test video demonstrations.

After Chess's demonstrations, the Automotive Body Parts Association (ABPA), represents more than 150 manufacturers, distributors and suppliers of aftermarket crash parts, notified its entire membership base that it should review with its suppliers the inherent properties and testing of all structural parts to ensure that adequate testing is available to support that imported and domestic parts perform equal to the OEM in vehicle collisions.

### COLLISION COVERAGE
- **California repairer charged with theft, insurance fraud**
- **Court upholds assignment of proceeds in Orso, Nationwide case**
- **SEMA registrations for RDE ahead of last year, SCRS says**
- **Barrett-Jackson to auction 1964 Fairlane with Sherwin-Williams paint job**
- **VeriFacts, LDC Equipment join forces on auto body forum**

More News

### COLLISION PRODUCTS
- **Air hammers come in long- and short-barrel varieties**
- **Dash kit targets Scion**
- **Leather-appearance sound barrier cuts noise**
- **LED lighting system designed for service lifts**
- **Face protector helmet is limited edition version**

More Products



**DISCUSSIONS**

**Grease**
08/29/2011

**Selecting an Auto...**
All, I am interested in buying an automotive oscilloscope. As a student, being able...

**overheating 1990...**
k a brief history of the car. Customer was having issues where the car wou...

**Back to school...**
Back to school time is here. How are you capitalizing on this good time for servi...

GO TO THE FORUMS



✉ **Check the e-newsletter(s) you would like to receive.**
Rollover each title for information.

**Distribution** + [more info]

**Collision Repair** + [more info]

In the event that sufficient testing is not available, ABPA recommended discontinuation of the production and sale of these part types as well as immediate notification to the estimating systems to eliminate these parts from their parts database submission.

A few days later, the Taiwan Auto Body Parts Association advised its members to stop selling and manufacturing non-certified parts. TABPA represents 22 Taiwan based companies manufacturing motor vehicle replacement parts for the global market. Member companies produce both OEM and aftermarket parts.

"This is a serious issue, that has not received enough attention from the industry in the past," says Chess. "These parts are critically affecting the structural design of a vehicle in its post-repair state. I think the ABPA has shown their leadership through their release, and we need to hold their members, the people and organizations that manufacture and supply these parts, accountable for the quality and safety of their product. The OEMs put a lot of money into research and development to ensure that the end product operates reacts and sustains damage in very specific way. Any replacement part made available to the market should be required to have that same expectation of performance."

SCRS said vehicle owners might not even know that they have inferior structural parts installed on their vehicles.

"Most importantly, there has to be a way to address the individuals who already have parts that have now been deemed 'inferior' on their vehicle," Schulenburg says. "It is not enough to accept that suppliers will deal with the issue on case-by-case basis if, or when, there is a problem. If the process and infrastructure are not in place, to support the ability to notify consumers when a problem has been identified, then we need to significantly fix that infrastructure before more parts are sold. If there is a parts problem generated from the OEM, there is an elaborate recall process in place. Every consumer is notified and their vehicle is corrected. These critical safety parts should not be treated with any less urgency. This is an issue that requires a proactive solution, rather than reactive; the motoring public deserves more."

SCRS has made the presentations prepared by Chess available on its Web site at www.scrs.com. It encourages every member of the industry to be familiar with this issue. SCRS said it hopes that the insurance industry will exhibit equal concern over the seriousness of this issue, which impacts both industries.

**RELATED LINKS**

**TABPA joins ABPA in taking action on aftermarket structural parts**
**ABPA recommends that distributors check structural parts**
**Quality of OEM and aftermarket parts**
**CAPA refutes CAA aftermarket parts survey**
**CAA survey questions quality of CAPA parts**

**POST A COMMENT**

Please complete the form below to post your comment.
**Bold** = Required
**Email Address** — Your email address will NOT be published.
Display Name — appears with your comment
City
State
Country
Remember me  ☐ Yes ⦿ No
**Comment** — read our privacy policy

Note: does not support HTML
All comments submitted are subject to review, and may be delayed before posting. We reserve the right not to post comments.

SUBMIT NOW >

**COMMENTS FROM OUR READERS**

Rich Woods · Neosho, MO, UNITED STATES
Posted Feb 02 2010 12:14PM
This issue has been carring on for way to long. Has any one been injuried because of these parts ?, have any shops been sued over this issue ? Have any insurance companies been sued over this ? Isn't it time to put this issue to bed ? Tell me, whats wrong with this picture ?

Show ?
Posted Feb 02 2010 08:42PM
Dream on buddy, Insurance company hands you an estimate and a list of who will sell the parts at the prices listed, no one will hand you a piece of paper saying my part has been tested and is every bit as safe and the same quality of oem. Parts should not be used unless they come with a safety warranty from the manufacture.

E Bradford · Wichita, KS, UNITED STATES



…

Posted Feb 03 2010 10:58PM

**Unfortunately, it will probably carry on for years to come. Until more testing is done to prove that there is a significant difference in the quality of an aftermarket part when compared to an OEM, things will carry on the same as always. Since when did Quality and Safety become important? Are we not being trained to ignore the importance of Quality and Safety? Its all about doing the repairs as cheap as possible so insurance companies will keep sending more work thru the door. We all know how this impacts the way cars are repaired. Its disgusting to see how shops have let insurance companies dictate how repairs will be done and what parts will be used. Makes me wonder how bad it will get before it turns around. If it does!**

More Comment

**Share** This Page:

Send                    Share



Internet Explorer cannot display the webpage



ADVANSTAR

Home | Media Kit | Contact Sales | Contact Editorial | Classifieds | All Content | Article Submission | Event Submission | Privacy Policy | Terms of Use | Linking and RSS Policy

© 2011 Advanstar Communications. All rights reserved. Reproduction in whole or in part is prohibited. Please send any technical comments or questions to our webmaster

EXHIBIT 43



# Crash Part
# Certification
# Study

## Conducted
## Pursuant To
## Senate Bill 1178
### (Statutes of 2001)

**Prepared by:**
**The Department of Consumers Affairs / Bureau of Automotive Repair**
in consultation with the California Department of Insurance
**January 1, 2003**

# OVERVIEW OF AFTERMARKET CRASH PART ISSUES

When vehicles are involved in a collision, the sheet metal parts or body panels that are used to repair them can originate from the original equipment manufacturer (OEM), or can be produced by an aftermarket manufacturer. These body parts are often referred to as "crash parts." OEM means that the part is produced for or by the vehicle's manufacturer, and sold through the manufacturer's new car dealer franchises. An aftermarket part is produced by independent manufacturers that are not affiliated with the vehicle manufacturer.

For years, the debate on aftermarket crash parts has been highly polarized, reflecting a range of 'pros' and 'cons' on the recommendation and use of these parts. Concerns have been raised over the quality and safety of aftermarket crash parts.[1] Many vehicle manufacturers and auto body repair shops argue that aftermarket crash parts are inferior to OEM parts and pose a possible safety risk. Many auto insurers and aftermarket manufacturers argue that aftermarket crash parts are safe and cost less than OEM parts, thereby helping to keep the price of OEM parts down. Insurance companies want to use aftermarket crash parts in estimating the repairs of motor vehicles; however, in California when an insurance company specifies the use of non-OEM crash parts, they must warrant that such parts are of like kind, quality, safety, fit and performance as OEM replacement crash parts. In California, auto insurance companies must also advise the consumer of their intention to use aftermarket crash parts.

The Certified Automotive Parts Association (CAPA) was created by the insurance industry in 1987 for the purpose of certifying aftermarket crash parts as being of like kind, quality, safety, fit and performance as OEM parts. Auto body repair facilities and auto body technicians have told the Bureau of Automotive Repair (BAR) that they feel they are pressured by the insurance companies into using aftermarket crash parts. Additionally, they have told the BAR that that many of these parts, require modification by the auto body repair technician to get the part to fit, and that this added labor increases their repair cycle time and labor costs. A few repair facilities have commented that the use of aftermarket crash parts (CAPA certified or not) is only saving the insurance companies money, with the auto body repair facility having to absorb the cost of part modification.

---

[1] Crash parts are generally made of sheet metal or plastic and are installed on the exterior of a motor vehicle. These parts include bumper components, hoods, doors, fenders and trunk lids and generally constitute the exterior of a motor vehicle, including inner and outer panels. Crash parts exclude mechanical parts such as batteries, filters, shock absorbers, and spark plugs.

# THE STUDY

On October 17, 2001, BAR mailed out invitations to interested parties, inviting them to a meeting on November 14, 2001 to discuss Senate Bill (SB) 1178. The purpose of the meeting was to provide interested parties the opportunity to present their ideas or comments to BAR on how best to conduct the study. The invitees included a representative of the California Department of Insurance (CDI), representatives from the various vehicle manufacturers, the new car dealer association, insurance companies, auto body repair shops, the California Autobody Association (CAA), a consumer advocacy representative from Consumers for Auto Reliability and Safety (CARS), and the Certified Automotive Parts Association (CAPA).

# November 14, 2001 Meeting

At the beginning of this meeting, BAR staff pointed out that California has very specific disclosure laws where the customer must be informed about the parts being used on their vehicle, and that the BAR has no issues about what parts are used so long as the customer is allowed to make the decision as an informed consumer before repairs are authorized.

According to auto body shops, the biggest problem with non-OEM crash parts is that they do not fit well. There was some discussion that the OEM parts do not always fit either. An auto body shop owner stated that ninety percent of the time OEM parts fit verses only fifty percent of the time non-OEM parts fit. Some insurance companies recommend that the less costly non-OEM parts be used claiming they keep insurance premiums down, yet other insurance companies will only recommend OEM crash parts. The auto body shops indicated they would use non-OEM crash parts if they fit, but the majority of the time the auto body shop has to make them fit, and they are not compensated for their additional time.

Other issues were raised about the use of non-OEM crash parts possibly voiding the warranty of the vehicle. Toyota, General Motors (GM) and Ford all indicate that their factory warranties transfer when repairs are completed with new Toyota, GM or Ford genuine parts. The use of salvage and or aftermarket parts are not covered by the Toyota, GM or Ford transferable limited warranty on such parts and all adjoining parts and systems which are caused to fail or rust as a result of the use of those parts. (Attachment F) Additionally, most leases specify in the lease that replacement parts must be OEM parts. Used car dealers indicated that used vehicles repaired with poor parts greatly diminishes the resale value of the vehicles and creates problems for them for alleged failure to disclose the condition of the vehicle. When consumers purchase a Mercedes, they are buying it, in part, for the craftsmanship. Who is going to buy a Mercedes with non-Mercedes parts? Dealers routinely check the crash history of a vehicle to see what kinds of parts were used in its repair; therefore, the trade in value might be hurt if non-OEM parts are used. The attendees' opinions on the safety and quality of aftermarket parts were similar to a January 2001 "Report To Congressional Requesters" by the United States General Accounting Office (GAO).

6

The GAO report stated that the debate on the quality and safety of aftermarket crash parts reflected a range of opinions on the safety of these parts as follows:

- <u>Aftermarket crash parts are unsafe.</u> According to this position—held generally by many collision-repair associations and repair shop owners—aftermarket crash parts are inferior to OEM parts in fit and finish and are dangerous. The evidence for this argument is mostly anecdotal, although they did see aftermarket crash parts that were clearly different from their OEM counterparts.
- <u>Aftermarket crash parts may be unsafe.</u> According to this position—held generally by new vehicle manufacturers—the impact of aftermarket crash parts on occupant safety is unknown. Therefore, the manufacturers recommend that only OEM parts be used to ensure that repaired vehicles perform to their original safety specifications.
- <u>Aftermarket crash parts are safe.</u> According to this position—held generally by insurance companies and aftermarket crash part manufacturers—aftermarket crash parts are cosmetic only and do not affect vehicle safety.

The BAR was concerned about "de-certified" parts and posed the question to CAPA as to what happens to the decertified part. CAPA stated that the distributor can return the inventory to the manufacturer for credit, refund or replacement, or they can remove the CAPA Quality Seal. However, CAPA has no control over the distributor, and the decertified part can still get sold. There is no way CAPA can force a distributor to return the parts or remove the CAPA Quality Seal. Additionally, it was asked, "What happens to the parts that are on vehicles that have now been decertified?" CAPA said that the majority of parts, 95% to 100%, are decertified because they don't fit. CAPA went on to state that if the consumer is unhappy with a part they can go back to the insurance company, because the insurer must warrant a non-OEM crash part if they required its use.

CAPA went on to indicate that every certified part has a unique number. Unfortunately, because CAPA has no control over the distributor of their certified parts, they have no record of where these parts go. **CAPA recently decertified a hood for a 1995-2000 Toyota Tacoma pick up.** The hood on the Toyota Tacoma pickup flew up during a test drive by the repair technician. This is clearly a serious safety problem which could cause an accident, possibly resulting in death, to any person that had the formerly CAPA certified hood installed on their Toyota Tacoma pickup. CAPA indicated on their Website that this particular hood did not have a CAPA Quality Seal and therefore is not considered a CAPA certified part even though it was listed in their catalog as a CAPA certified part. This is a clear example of how the certification process has failed to protect the consumer. CAPA went on to state, "We see no reason why a repairer would intentionally remove a CAPA seal. Doing so eliminates their ability to prove to their customer that a CAPA certified part was installed or to quickly track the history of the part." The manufacturer of CAPA certified aftermarket parts is responsible for attaching CAPA Quality Seals on all certified parts. The purchase of CAPA Quality Seals funds the CAPA program. The price per seal is $0.75 and sales to participants are in multiples of 5,000 seals only. CAPA participants must affix CAPA Quality Seals to all certified parts at the end of the manufacturing process and before warehousing. The CAPA part manufacturer could have a "financial incentive" to <u>not</u> place the CAPA Quality Seal on a

EXHIBIT 44



Home | Magazine | Ratings/Reports | Forums
Safety alerts | Recalls | Site map | Search | Help/FAQs
Subscribe | E-mail | CR products & services



*The following letter, written by Consumer Reports Associate Editor Jeff Blyskal, is a point-by-point rebuttal of CAPA's press release of January 28, 1999.*

Back to CAPA's
response

February 8, 1999

Jack Gillis
Executive Director
Certified Automotive Parts Association

This letter is in response to your press release of January 27.

While we understand your views and opinions about imitation crash parts, we hope you understand our responsibilities as an independent publication and testing organization that represents no interests other than those of the consumer.

Our article is about imitation body parts generally and not just those certified by CAPA. It clearly states our support for competition and for CAPA's goals. But product quality is a critical element in this equation, and we applied our long-standing testing and technical expertise to provide readers with our independent assessment of the quality of parts we bought on the open market that any consumer might have installed on their car.

Your press release, also posted on the CAPA web site, contains many erroneous statements, which we urge you to correct.

For example, you say that imitation parts are "one reason why insurance premiums have stabilized, or in some cases, gone down in recent years." Yet, when we checked that assertion with sources at insurance companies, none provided hard data to prove it. To the contrary, according to the Insurance Information Institute (III) citing National Association of Insurance Commissioners (NAIC) data, the average auto insurance premium has neither stabilized nor gone down since 1985, when insurers began recommending imitation parts; rather, average premiums increased from $390 in 1985 to $691 in 1996—a 77% rise.

So, given the contrary hard data from III and NAIC and the lack of any evidence from you or insurers in support of your claim, we fairly reported both your assertion and the difficulty in finding supporting data.

Here, point-by-point, is our response to your press release:

1. Contrary to the "facts" you cite:
    o We did hear of <u>other imitation-part hood problems</u>, as pointed out in our report;

o We personally examined the Della Rova hood and found that the striker had broken off the CAPA hood and that the OEM latch remained solidly attached to the car itself. The reporter's videotape of that examination was reviewed by our Technical and Editorial departments. As you will recall, in numerous interviews and faxes over two months, you never once said the failure "could have been due to a defect in the car company latching mechanism, not a hood failure," as you now speculate. To the contrary, when I asked you to comment on the hood, you said you didn't know much about it and that CAPA had never examined it.

o The recall of motor vehicles with potential problems with their original--not replacement--OEM hood does nothing to demonstrate the quality of non-OEM replacement hoods.

2. NHTSA says it hasn't received complaints about imitation parts. But anonymous-brand imitation parts are essentially "invisible" to the complaint and recall system mainly because the parts have no manufacturer's name stamped on them. Also, insurers don't typically tell customers who made the generic "quality replacement part."

The Insurance Institute for Highway Safety's 11-year-old test on a car stripped of all body parts (except for the hood) may show that fenders aren't what protects passengers in a crash, but it hardly supports a conclusion that imitation parts are therefore safe and have no potential to cause harm.

During our many interviews, you never offered or told me about any Thatcham crash tests, so we could not have chosen to ignore such tests, as you now claim. In separate interviews, IIHS President Brian O'Neill and IIHS statistician Kim Hazelbaker told me that the one IIHS test and the Volvo test we cited in our report were the only crash tests done on imitation parts. They also never mentioned any Thatcham tests.

3. The claims made by the repair shops were backed up by the 14 years of twice-yearly IMR surveys of 500 repair shops and the Frost & Sullivan survey of 160 repair shops. IMR and Frost & Sullivan are independent and credible sources, and we have no reason to believe they have fabricated their results--especially when their findings were also backed up by our own reporting and testing.

Our reporting did include interviews with Charles Hogarty, President and CEO of Keystone Automotive Industries, the largest U.S. distributor of imitation crash parts, and Stan Rodman, executive director of the Automotive Body Parts Assn.

4. One of the first questions we asked the Interinsurance Exchange for the Automobile Club of Southern California, was how it determined that imitation parts have quality problems. They told us they keep in close contact with a network of 200 repair shops, and the insurer's representatives regularly see the problems firsthand in the field.

5. We not only accurately reported Clarence Ditlow's failure to provide compelling evidence, but when we repeatedly pressed you as to whether CAPA parts are higher quality than non-CAPA parts, you repeatedly declined to make that claim.

A relatively low number of officially reported complaints about CAPA parts, which we reported, is not "compelling evidence" that CAPA parts are better than non-CAPA parts. For one thing, we know of no comparable data on officially reported complaints against non-CAPA parts, and you have not offered us any. Further, the "invisibility" problem explained above would tend to keep down complaints, as would the reluctance repair shops have in hunting down part numbers and filling out paperwork to file a complaint with CAPA, as Plucinski told us.

The source you describe simply as a "repairer" who criticized CAPA's complaint program was Clark Plucinski--a CAPA board member, a member of ASA, and the owner of a chain of 30 repair shops. We were referred to Plucinski in a Dec. 23 fax from CAPA board member Clarence Ditlow, who recommended him as "the person most knowledgeable within ASA about CAPA..." Plucinski's statements were his opinion, based on his vast experience. We consider him a knowledgeable source, and we identified him clearly in our report.

6. We reported that CU did help fund CAS during its early years and that CAS's insurance company funding dropped dramatically since the mid 1970s.

7. This accusation is perplexing in light of the fact that you thoroughly discredited the Ford study to me during my research. "The Ford study," you wrote in your Dec. 24 fax, "was admitted to be false and misleading by the author of the study when under oath in a recent court case." You also sent me (twice) CAPA's 6-page December 1997 press release attacking Ford's press release about the report and raising doubts about the full 88-page report, which is what we obtained.

Your January 27, 1999 press release creates the false impression that the Ford study found a great deal of evidence that CAPA parts were better than OEM parts. In fact, the Ford study, taken as a whole and reasonably interpreted, does not support your assertion that the CAPA parts "often exceeded the performance of the Ford parts."

By and large, the Ford report found mostly mixed results

and didn't **consistently** show CAPA parts are better or even equal to OEM, but it was consistent with what <u>we reported</u>: "The quality of imitation crash parts can vary widely." Nevertheless, we chose not to include any mention of the study, because there was such an abundance of other more timely and more independent material available.

8. The CAPA parts that failed the first CIC demonstration (it was a demonstration, not a "test") were decertified by you personally; what better evidence that the demo was valid?

We also reported the results of the second demonstration: "...all the CAPA and non-CAPA substitute parts fit well."

Contrary to what you say about "serious defects" in the original and replacement OEM hoods, Lou Delisio—who conducted **all these** demonstrations—says there was no replacement OEM hood in the second demo. Indeed, there were no replacement OEM parts in either the first or second demos.

9. This third CIC demonstration took place on Jan. 14, 1999, about two weeks *after* we went to press. We understand this was a blind test.

Furthermore, blind tests were used in the parts of our test program that involved an outside repair shop's installation of CAPA and OEM fenders and their judgment of fit. The part of our testing that involved our own engineer's installation and judgment of fender fit was not blind, but it was unbiased and consistent with the blind test results. CU has no stake in the outcome of its tests and conducts product evaluations fairly and objectively.

10. The response in number 5 (above) bears repeating here: When we repeatedly pressed you whether CAPA parts are higher quality than non-CAPA parts, you consistently declined to make that claim. Clarence Ditlow did not give us any evidence for his assertion, beyond saying the existence of CAPA standards per se make CAPA quality higher.

The only convincing evidence we could find that CAPA parts might be of better quality than non-CAPA parts was discovered independently by us and was <u>fully described</u>: "A twice-a-year survey of 500 repair shops done for the auto industry by Industrial Marketing Research of Clarendon Hills, Ill., does suggest that CAPA parts are better than non-CAPA and that the quality of all imitation parts is improving."

The bumper basher results you cite proves nothing about relative quality of CAPA and non-CAPA parts, since CAPA doesn't certify bumpers.

The CAPA manual says nothing about the quality of non-

**these** demonstrations--says there was no replacement OEM hood in the second demo. Indeed, there were no replacement OEM parts in either the first or second demos.

9.  This third CIC demonstration took place on Jan. 14, 1999, about two weeks *after* we went to press. We understand this was a blind test.

    Furthermore, blind tests were used in the parts of our test program that involved an outside repair shop's installation of CAPA and OEM fenders and their judgment of fit. The part of our testing that involved our own engineer's installation and judgment of fender fit was not blind, but it was unbiased and consistent with the blind test results. CU has no stake in the outcome of its tests and conducts product evaluations fairly and objectively.

10. The response in number 5 (above) bears repeating here: When we repeatedly pressed you whether CAPA parts are higher quality than non-CAPA parts, you consistently declined to make that claim. Clarence Ditlow did not give us any evidence for his assertion, beyond saying the existence of CAPA standards per se make CAPA quality higher.

    The only convincing evidence we could find that CAPA parts might be of better quality than non-CAPA parts was discovered independently by us and was <u>fully described</u>: "A twice-a-year survey of 500 repair shops done for the auto industry by Industrial Marketing Research of Clarendon Hills, Ill., does suggest that CAPA parts are better than non-CAPA and that the quality of all imitation parts is improving."

    The bumper basher results you cite proves nothing about relative quality of CAPA and non-CAPA parts, since CAPA doesn't certify bumpers.

    The CAPA manual says nothing about the quality of non-CAPA parts.

    The confidential Entela test reports you cite involved only CAPA parts--all of which received certification. They did not involve non-CAPA parts, and said nothing about what happened to the parts manufactured before certification.

11. We asked insurers and OEMs about crash-part corrosion warranties and found non-OEM and OEM warranties to be generally on a par with each other--setting aside company-specific loopholes, details, and outliers. That being the case, relative quality remains the priority, because consumers should get top quality in the first place. That way, it's less likely that they'll need to chase down a warranty recovery later. Intrinsic part quality is especially important for used-car buyers, since most non-OEM and OEM warranties don't protect subsequent owners. Warranties do not protect this group of consumers.

12. The extra repair time for CAPA parts over OEM parts in our testing was cited as a measure of the relatively poor initial fit of CAPA parts, not as a comparison with flat rates in shop manuals.

Nevertheless, your press release is in error, because you never suggested to anyone at CU that we should compare actual repair time with manual-recommended maximum repair time and for good reason: To our knowledge, you were not aware that we were doing fit testing.

13. The CAPA Quality Standards manual specifies a 500-hour salt-spray test. You sent this manual to me in November, and we relied on its contents. However, the key point remains that CAPA fenders rusted badly after 168 hours in our test--much sooner than either 500 or 1000 hours.

14. When you and Ditlow raised claims regarding ASA during the final preparation of our article, we reviewed a copy of the ASA press release on the matter. It states, "The Automotive Service Association Board of Directors voted March 12 [1998] to withdraw the association's support of the Certified Automotive Parts Association...after more than 11 years of continued support and participation." We also sought to verify your claims with CAPA board member Plucinski, who was recommended to us by Ditlow. He told us that ASA had long supported CAPA but had grown frustrated with CAPA's slow progress; that ASA was not behind the "anti-competitive part demonstration" described by you and Ditlow; and that automakers did not provide financing to ASA. Further, ASA says it has campaigned at the state level for disclosure, not a ban of imitation parts.

15. At the interviews in Grand Rapids, Entela's research and development director, Greg Marshall, did say the OEM part variations are at most 60/1000ths of an inch. I double checked this with him by phone as we were getting the story ready for press. Marshall confirmed that the OEM gap variations he was referring to were 60/1000ths of an inch.

16. From the notes of my December 29 interview with you, you said: "The new-test fit program is only for newly certified parts....It's not a requirement for already certified parts unless they get five complaints within a year."



In sum, we see nothing in your press release that supports your contention that our report is rife with "errors, unsubstantiated claims, and missing facts" or is "inaccurate."

Our report stands as published.

Sincerely,

Jeff Blyskal,
Associate Editor

EXHIBIT 45

**Certified Automotive Parts Association**
Washington, D.C.

MANUFACTURER ADVISORY COMMITTEE MEETING
MINUTES
November 2 & 3, 1993
Las Vegas, NV

## Attendees

MANUFACTURERS: Juh Fuei Lin, Andy Wang, Yung Shine; Kyeong T. Yoon, Daewoo; H.C. Lin, Gordon; Sam Lee, Andy Huang, Tong Yang; John Chen, Roseanne Yu, Apex; Jason Jung, Conjoin Key; Frank Milligan, Polywheels; Bill Singleterry, Colonel's/Nupar.

TECHNICAL COMMITTEE: Jerry Dalton, Craftsman Auto Body; Paul Horng, Materials Research Laboratories; Ben Parr, State Farm.

BOARD MEMBERS: Gerry Colbert, State Farm; Gary Mellini, Allstate; Doug Theiss (for Eldon Ziegler), Nationwide; Keith Waldrop (for Bob Logan), USAA; Tim Clark (for Wayne Browne), Safeco; Frank McGiboney (Advisor), Allstate.

BODY SHOP ADVISORY COMMITTEE: Jerry Kottschade, Jerry's Body Shop; Chuck Maybaum, Tech-Cor; Clark Plucinski, BCP Auto Body.

CAPA STAFF: Jack Gillis, Executive Director; Karen Fierst, Deputy Executive Director; Erika Sova, Administrator; Karen Vail, CAPA Administrator North America; John Bardaville, CAPA Administrator Taiwan; Ting-Nan Lo, Entela Taiwan.

OBSERVERS: Mike Ferrell, Richard Wright, Patrick Guarino, State Farm.

The two day meeting was divided into three sections: quality, market place and program\technical issues.

The quality portion included visits to two local auto body shops. The first shop was Performance Auto Body. It's owner, Dave Yeagley, is the state I-CAR Chairman. He uses only CAPA certified parts or OEM. He has, however, had problems with CAPA parts and getting distributors to accept a return. Because of this, he takes the time to test fit every part prior to painting. Although, this increases his cost, it avoids problems with the distributor when a part must be returned. Test fits of a non-CAPA certified aftermarket part and an OEM part were done at this shop to illustrate the difference in quality and the amount of time necessary to get the fit on the car.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

Suite 302/1518 K Street, NW/20005

202-737-2212/202-737-2214(Fax)

Manufacturer Advisory Committee Minutes                          page 2
November 2 & 3, 1993                                   Las Vegas, NV

Falcon Auto Body is a high volume, direct repair shop for eight insurance companies, but uses no aftermarket sheet metal. General Manager, Tim Groves, explained that their reason for not using aftermarket sheet metal parts is that, in the past, they have been dissatisfied with the quality. They had only recently learned about CAPA and had not yet used CAPA parts.

Lastly, the delegation went to the local Allstate headquarters to tour a drive-through facility. The tour included an explanation of the collision repair process from the adjuster's perspective.

Tuesday afternoon the meeting focussed on the marketplace. Gillis explained that CAPA is not involved in marketplace transactions, but that CAPA is interested in facilitating discussion between the appropriate industries. The purpose of this discussion was to pinpoint why there aren't many certified parts and why it's hard to get the parts which are certified.

Some manufacturers indicated that they are receiving the message that CAPA parts are in demand. They have recently conveyed to their manufacturing staff that it is, in fact, important to make certified parts. In order to show the manufacturers the size of their potential market, Parr provided a list of the top selling 136 aftermarket crash parts. Only 30 are certified. This discussion was significantly limited by the lack of distributor participation.

Milligan suggested that CAPA advertise or promote name recognition among body shops and adjusters to enhance CAPA name recognition. Gillis indicated that, although advertising CAPA is a priority for 1994, there is a "chicken and egg" dilemma. If the public starts asking for the parts and there are none, it could affect the credibility of the suppliers and the program.

Mr. Lin of Yung Shine, speaking on behalf of the manufacturers, suggested that if CAPA would qualify manufacturers which make a certain type of commitment to CAPA, those manufacturers could use the qualification as a marketing tool, which would increase competition and increase the number of parts. Gillis reported that CAPA is already working on this type of proposal. The majority of the afternoon's discussions involved different approaches to this issue. CAPA will submit a written proposal to the manufacturers for comment.

The Taiwanese manufacturers requested that TABPA be recognized as a forum for discussion about CAPA issues relating to them. CAPA has avoided this in the past, since there are TABPA members who are not affiliated with CAPA, and CAPA Participants who are not members of TABPA. However, in light of

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

TN014897                          AR013652        TET 002636
                                                  1-14-98
                                                  C.  118

the manufacturers' request, CAPA agreed, with the stipulation
that TABPA invite all CAPA Participants, regardless of their
affiliation with TABPA, to the meetings where CAPA would be
discussed.

The third part of the meeting, which was held on Wednesday,
November 3, focussed on technical and internal programmatic
issues.  Certain program modifications which have been made
within the last five months were clarified and the next phase of
CAPA was discussed.

In order to put the discussion in perspective, Gerry
Colbert, Board member and representative from State Farm,
described the environment in which aftermarket parts are being
sold.

Colbert cited the recently enacted New York State Insurance
Regulation, State "prior approval" regulations, Federal patent
infringement legislation, NAFTA, and class action litigation
against insurance companies regarding aftermarket parts as
significant issues which will have a great impact on the
manufacturer's business.

He pointed out that the attitude each manufacturer takes
towards CAPA will play a significant role in how these items
effect their business.

He explained that CAPA, which has been funded by the
insurance industry for more than six years, has made certified
aftermarket parts legitimate.  He explained that the insurance
industry is growing tired of funding CAPA since there seems to be
no sign of an increase in parts, nor has a financial commitment
by the manufacturers been illustrated.

Regarding quality, Colbert compared the current reputation
of products made in Taiwan to the reputation of Japanese products
in the 1950s and 1960s.  He emphasized the evolution of the
Japanese reputation for quality and challenged the Taiwanese
manufacturers to work to change their poor quality reputation.

Colbert also emphasized that if the parts were high quality
a public relations campaign would not be necessary.

TET 002637
1-14-98

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

TN014798                              AR013653

C. 11820

I.  Current Program Discussion

    A.  Program Modifications

        1.  Testing in Taiwan
            Gillis reported that CAPA is actively
            investigating doing new part material testing in
            Taiwan.  CAPA will keep the manufacturers
            informed.
        2.  Advertising CAPA
            Gillis reiterated his remarks of the previous day
            and added that CAPA intends to begin its body shop
            education campaign at NACE.
        3.  Eight Step Corrective Action Request/Complaint
            Resolution Program
            Gillis reported that CAPA will use the Eight Step
            Corrective Action Request (8-Step CAR) to more
            thoroughly rectify problems found as a result of
            complaints. Entela reports that manufacturers are
            generally pleased with the technical assistance
            they are receiving from them as a result of the 8-
            Step CAR.

    B.  Program Clarifications

        1.  Seal on every part
            Gillis reported that CAPA will not change its
            policy about requiring a seal on every part.  CAPA
            has been in touch with European consumer groups,
             insurance companies, and body shops.  One of
            CAPA's goals is to establish the CAPA Quality Seal
            as an internationally recognized sign of quality.
            According to our standards *every* certified part,
            regardless of where it is sold, must have a seal.
        2.  Sale of decertified part as non-certified
            Fierst explained that the sale of decertified
            parts as "non-certified" was inappropriate and
            misleading.  The sale of decertified parts has
            caused confusion in the marketplace.  Because
            there were no distributors present this discussion
            was limited.  The Taiwanese manufacturers
            indicated that, in the event of a decertified lot,
            they would be willing to correct the problem and
            run a new certified lot, if the order requiring a
            certified part were large enough to warrant a new
            lot run.  CAPA encouraged the manufacturers to
            discuss this with the distributors.
        3.  New part design
            Gillis reported that CAPA has no intention of
            requiring any specific method for tool and die

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AR013654

Manufacturer Advisory Committee Minutes                     page 5
November 2 & 3, 1993                                    Las Vegas, NV

development, nor will it provide drawings.  Doing
so would jeopardize CAPA's ability to function as
an independent third party certifier.

II.  CAPA: The Next Phase

A number of program revisions were briefly outlined.  CAPA
will send more specific details to the manufacturers for comment
on a fair phase-in time frame.  The revision items include:

A.  Statistical Process Control (SPC)

B.  New Part Approval time limits

C.  CAPA inspecting all new part measurements

D.  Aftermarket master parts

E.  Welding Jigs required for all new parts

F.  In-process checking of existing parts with flush and
gap problems

G.  Requirement that all new certifiable parts for cars
sold in the U.S. be certified.

III. Manufacturer Issues

A.  Mr. Chen and Mr. Lin, speaking on behalf of the
Taiwanese representatives present made the following
recommendations:

1.  CAPA should allow the use of a distinctive package
for certified parts made by manufacturers who meet
certain quality criteria.  CAPA will explore this
idea.

2.  Manufacturers should introduce a wider variety of
parts for certification.  Since some of these
parts are small and inexpensive, CAPA should
consider either developing a smaller seal and/or
charging less for seals on these parts.  Gillis
applauded the idea and said that as soon as CAPA
receives a list of parts and time frames CAPA will
address the seal issues.

3.  The Taiwanese manufacturers requested that CAPA
waive its 12 month waiting period, new material
test and $1,500 fee for resubmittal of a
decertified part for a limited time.  It is hoped
that this would give the manufacturers an
opportunity to demonstrate their commitment to the

**CONFIDENTIAL**
SUBJECT TO PROTECTIVE ORDER

**CONFIDENTIA**
SUBJECT TO PROTECTIVE ORD...

Manufacturer Advisory Committee Minutes                          page 6
November 2 & 3, 1993                                        Las Vegas, NV

> program.  Gillis indicated that CAPA is prepared
> to waive the waiting period and fee.  Entela will
> advise about the material tests on a case by case
> basis--depending on the material test records on
> file.

B.   Frank Milligan of Polywheels requested that CAPA revise
     its facility assessment approach from a pass/fail
     system to one which allows a greater range of
     evaluation--enabling a better barometer for compliance.
     CAPA will investigate this approach.

C.   Mr. Milligan suggested that all facilities be assessed
     by the same assessor.  CAPA does not think this is
     necessary.

D.   Mr. Milligan asked for an explanation of why CAPA
     performs material tests on finished parts, rather than
     on test plaques.  Entela's material test staff will
     respond.

E.   Mr. Singleterry asked about the status of the plastic
     standard revision.  Entela had to do additional testing
     to verify its recommended approach.  CAPA hopes to have
     the new standard in place by early 1994.

F.   There was a discussion about the certification of
     bumper covers with built-in reinforcement bars.  Mr.
     Singleterry suggested that CAPA accept manufacturer
     contracted impact test results from independent sources
     as part of the new part approval process for rebars.
     CAPA will investigate this.

G.   It was decided that:

     1.   Mr. Lin will report to TABPA regarding the two day
          meetings.  Ting Nan Lo of Entela-Taiwan, who
          served as interpreter in Las Vegas, will be
          invited to attend on CAPA's behalf.

     2.   CAPA will submit, for comment, written plans
          regarding new technical and program issues.
          Participants should comment by January, 1994.

     3.   The next Manufacturer Advisory Committee Meeting
          will convene in Taiwan during the last week of
          February or the first week of March, 1994.

**CONFIDENTIAL**
SUBJECT TO PROTECTIVE ORDER

EXHIBIT 46

CONFIDENTIAL

**TECH-COR, Inc.**

January 7, 1988

J.P. McFADDEN
JAN 11 1988

Mr. William J. Gruner
Asst. Vice President, Property

## Re: Aftermarket Parts

Bill,

As you know, we received a supply of aftermarket parts from MRL. These are parts that MRL secured from the better manufacturers, and verified that they fit fixtures available at the various manufacturers. MRL was interested in determining if their inspection process and the Taiwan fixture quality was capable of producing and delivering an acceptable part in the United States market.

We tested 21 parts. We have a lot more that could be tested, but these should represent a sampling of what was sent to us. To test them all will take a lot of time and effort, and will probably not produce a result too much different than this one.

As you will note in the report, only 10 of the 21 parts tested had an acceptable fit. This 50% factor corresponds to the prior survey that we did in 1987. We used basically the same criteria to determine fit as we did before.

In addition, we determined that 5 of the 21 parts that we tested carried the same parts numbers as those listed in ABPA's Certification catalog. Of these 5 carrying the CAPA designation, only 2 had an acceptable fit.

Needless to say, the results of the survey are discouraging, but I suspected that this might happen, and at this point in time, I don't have any confidence in the Detroit Testing Lab Certification program. While I have high regard for MRL, they know and understand they are working within the confines of utilizing the fixtures available in Taiwan. Those fixtures in Taiwan are produced by measuring OEM fenders, not the actual vehicles.

AP 040269

AP9 000825

Mr. William J. Gruner
January 7, 1988
Page Two

As we have discussed at Tech-Cor, and at the NAII meeting,
laser measurement of vehicles is possible in the United States,
and those specifications can be then sent to Taiwan, and MRL
can use their laser measuring equipment to assist in the design
of the die in Taiwan. That is probably the only way, short of
sending vehicles to Taiwan, that we will get any accurate measure-
ments.

Knowing what I know now, it is hard for me to conceive that Ford,
Toyota, General Motors and others might not also do the same test
on "certified" parts. I could visualize one of the manufacturers
having a bunch of their cars lined up in the lab, and holding
a press conference, showing the reporters and other interested
parties how their OEM fenders fit the cars, and the certified
aftermarket parts do not. What a potential disaster.

Bill, at this point, I have instructed Dave DeJohn to cease all
further activity on aftermarket testing. We will save the parts,
and I will also prepare a separate letter to MRL, thanking them
for their assistance, giving them the information that has de-
veloped so far. Needless to say, the CAPA has their challenges
cut out for them.

Donald W. Cameron

htd

cc: J. F. McFadden  w/attachments
    M. J. Valotta  w/attachments
    D. S. DeJohn  w/attachments

AP 040270

AP9 000826

EXHIBIT 47

1   James McManis, State Bar No. 40958
    Michael Reedy, State Bar No. 161002
2   MCMANIS FAULKNER
    50 W. San Fernando St., Tenth Floor
3   San Jose, CA 95113
    Telephone: (408) 279-8700
4   Telecopy: (408) 279-3244
5   jmcmanis@mcmanislawlaw.com
    mreedy@mcmanislaw.com
6
    Attorneys for the Plaintiffs
7   [Additional counsel appear on signature page]

8                       UNITED STATES DISTRICT COURT
9                     NORTHERN DISTRICT OF CALIFORNIA
                              SAN JOSE DIVISION
10

11  SARAH PEREZ, MICHELLE LACKNEY,      ) CASE NO. C O6-01962 (JW) (PSG)
    RACHEL STEWART AND  RACHEL          )
12  HARDYCK, on behalf of themselves and )
    others similarly situated,          )
13                                      )
          Plaintiffs,                   )
14                                      )
                                        )
15             v.                       )
                                        )
16  STATE FARM MUTUAL AUTOMOBILE INS. ) DECLARATION OF R. STEPHEN
    CO., STATE FARM FIRE AND CASUALTY  ) BERRY
17  CO., STATE FARM GENERAL INSURANCE  )
    CO.                                 )
18                                      )
    ALLSTATE INDEMNITY CO., ALLSTATE    )
19  INSURANCE CO., ALLSTATE PROPERTY    )
    & CASUALTY INSURANCE CO.            )
20                                      )
    GEICO GENERAL INSURANCE CO.,        )
21  GEICO CASUALTY COMPANY, GEICO       )
    INDEMNITY CO.,                      )
22                                      )
    CERTIFIED AUTOMOTIVE PARTS ASS'N.   )
23                                      )
    LIBERTY MUTUAL INS. CO. and         )
24                                      )
    UN-NAMED INSURANCE CONSPIRATORS     )
25                                      )
          Defendants.                   )
26
27
28

Declaration of R. Stephen Berry - Page 1                    Case No. 5:06-01962 (JW)(PSG)

1    I, R. Stephen Berry, am over 18 years of age and have knowledge as to the matters herein.

2    I am also one of Plaintiffs' counsel in the instant action.

3

4        Relating to the numbers of policyholders in the four proposed classes alleged herein, I have

5    asked OSKR, LLC of Emeryville, California, to estimate approximate class sizes based on

6    Defendants' data produced and relative market shares.  The results are attached hereto as Exhibit A.

7

8        The estimates indicate there are over four million potential class members in the Allstate

9    class, over five million in the State Farm class, over 700,000 in the GEICO class, and over 200,000

10   in the Liberty Mutual class.

11       I declare under penalty of perjury that the foregoing is true and correct.  Executed on

12

13   September 22, 2011.

14

15                                                      R. Stephen Berry

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration of R. Stephen Berry - Page 2

Case No. 5:06-01962 (JW)(PSG)

EXHIBIT A

## Number of Policies by Defendant in 2004, 2006 and 2009 Exposure Years Estimated based on Allstate Premium Data

**Panel A. Estimate of Policies per Percent of Market Share using Allstate Data**

| | 2004 | 2006 | 2009 |
|---|---|---|---|
| Number of Unique Policies with Collision/Comprehensive Coverage in Allstate Premium Data | 952,763 | 1,043,757 | 1,111,407 |
| Allstate's Share of Written Premium for California Private Passenger Auto Insurance | 8.6% | 9.6% | 8.5% |
| Estimated Policies per Percent of Market Share  (Number of Policies / Market Share * 0.01) | 110,915 | 109,180 | 131,141 |

**Panel B. Market Share of Private Passenger Automobile Insurance in California.**

| | 2004 | 2006 | 2009 |
|---|---|---|---|
| Allstate Insurance Group | 8.6% | 9.6% | 8.5% |
| Berkshire Hathaway Group (GEICO) | 3.0% | 3.2% | 4.9% |
| Liberty Mutual Group[1] | 1.3% | 1.3% | 3.6% |
| State Farm Group | 13.4% | 12.9% | 13.6% |
| Total | 26.2% | 27.0% | 30.5% |

**Panel C. Estimated Number of Policies**

| | 2004 | 2006 | 2009 |
|---|---|---|---|
| Allstate Insurance Group | 952,763 | 1,043,757 | 1,111,407 |
| Berkshire Hathaway Group (GEICO) | 336,074 | 352,650 | 641,660 |
| Liberty Mutual Group | 139,753 | 143,025 | 467,137 |
| State Farm Group | 1,480,720 | 1,409,509 | 1,778,075 |
| Total | 2,909,310 | 2,948,941 | 3,998,280 |

**Panel D. Number of Policies Issued in 2004 as per Rate Filings**

| | 2004 |
|---|---|
| Allstate Insurance (ALLSTATE 0001162) | 4,131,890 |
| Berkshire Hathaway Group (GEICO) (PEREZ021405) | 702,593 |
| Liberty Mutual (LIB-PRZ-011897 and 011900)[2] | 235,947 |
| State Farm (p.47 of PV-21192RA) | 5,748,280 |
| Total | 10,818,710 |

Sources:

Allstate Premium data (ALLSTATE 0008007-12).

California Department of Insurance's annual market share reports of all lines of business conducted by licensed property and casualty insurers in the State of California. (http://www.insurance.ca.gov/0400-news/0200-studies-reports/0100-market-share/) ALLSTATE 0001162, PEREZ020357, LIB-PRZ-011897, PV-21192RA.

Notes:

1. Liberty Mutual acquired insurance companies affiliated with SAFECO Group on April 23, 2008. The 2009 market share for Liberty Mutual Group includes SAFECO.

2. Liberty Mutual's data on policies issued is for one year ended June 30, 2004.  All other rate filing data represent one year ended December 31, 2004.

3. All insurers except Liberty Mutual report the aggregate total policies for liability and property damage.