United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| Sarah Perez, et al., | NO. C 06-01962 JW |
| Plaintiffs, | **AMENDED ORDER GRANTING DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF ALLEN WOOD; DENYING PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION** |
| v. | |
| State Farm Mut. Auto. Ins. Co., et al., | |
| Defendants. | |

Plaintiffs[1] bring this putative class action against Defendants,[2] alleging an anticompetitive conspiracy in violation of California's Cartwright Act, Cal. Bus. & Prof. Code §§ 16720, 16750, and California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.* Plaintiffs allege that Defendants unlawfully conspired and established a sham organization to prevent insurance companies from competing based on the quality of repairs provided under their auto insurance policies. The Court has jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d).

---

[1] The named Plaintiffs are Sarah Perez, Michelle Lackney, Rachel Stewart and Rachel Hardyck.

[2] State Farm Mutual Automobile Insurance Company ("State Farm"), Allstate Indemnity Company ("Allstate"), GEICO General Insurance Company ("GEICO"), Liberty Mutual Fire Insurance Company ("Liberty Mutual") and Certified Automotive Parts Association ("CAPA") (collectively, "Defendants").

Presently before the Court are Defendants' Motion to Exclude the Testimony of Plaintiffs' Expert Mr. Allen Wood ("Wood")[3] and Plaintiffs' Second Renewed Motion for Class Certification.[4] The Court conducted an evidentiary hearing on July 9, 2012. Based on the papers submitted to date, the evidence presented at the hearing and oral argument, the Court GRANTS Defendants' Motion to Exclude and DENIES Plaintiffs' Renewed Motion for Class Certification.[5]

## II. BACKGROUND

A detailed summary of the factual background and procedural history of this case is provided in the Court's March 23, 2011 Order.[6] The Court reviews additional procedural history as is relevant to the present Motions.

On September 26, 2011, Plaintiffs filed their original Motion for Class Certification.[7] On November 29, 2011, the Court denied as premature Plaintiffs' Motion for Class Certification, on the ground that Plaintiffs had not yet shown that they would be able to establish antitrust injury and damages on a class-wide basis as to Defendants State Farm, GEICO and Liberty Mutual.[8] Accordingly, the Court reopened discovery for the exclusive purpose of allowing Plaintiffs to obtain data from Defendants State Farm and GEICO equivalent to the data they already obtained from Defendants Allstate and Liberty Mutual. (Id. at 5.)

---

[3] (Defendants' Joint Notice of Motion and Motion to Exclude Testimony of Plaintiffs' Supplemental Parts Expert Allen Wood; and Supporting Memorandum of Points and Authorities, hereafter, "Motion," Docket Item No. 637.)

[4] (Notice of Renewed Motion for Class Certification, Docket Item No. 633.)

[5] This Amended Order corrects a typographical error on page 11 of the July 19, 2012 Order and supercedes that Order. (See Docket Item No. 658.)

[6] (Order Denying Defendants' Motion to Dismiss; Granting Plaintiffs' Rule 56(d) Motion; Denying Defendants State Farm and Liberty Mutual's Motions for Summary Judgment; Referring the Parties to Magistrate Judge Grewal for Rule 56(d) Discovery, hereafter, "March 23 Order," Docket Item No. 251.)

[7] (See Docket Item No. 502.)

[8] (Order Denying as Premature Plaintiffs' Motion for Class Certification at 4-5, hereafter, "November 29 Order," Docket Item No. 568.)

2

On December 7, 2011, the Court denied each of Defendants' Joint Motions to exclude the testimony of Plaintiffs' various experts, including that of Mr. Wood.[9] In so doing, the Court concluded that Mr. Wood's experience in the field of automotive repair qualified him as an expert on the quality of automobile repair parts, and found that he could testify as to his opinion on the lower quality of non-OEM parts. (Id. at 10-12.)

On February 24, 2012, Plaintiffs filed a Renewed Motion for Class Certification. (See Docket Item No. 591.) On May 2, 2012, the Court again denied Plaintiffs' Motion for Class Certification without prejudice.[10] In its May 2 Order, the Court found that Plaintiffs had not satisfied their burden of establishing commonality, because Plaintiffs had not yet put forth a method of ascertaining which categories of non-OEM parts were generally inferior to OEM parts. (Id. at 3.) The Court found that under the Ninth Circuit's decision in Ellis v. Costco,[11] it could not certify a class without first conducting a "rigorous analysis" of the evidence and methodology put forth by Plaintiffs to establish commonality. (Id. at 4.) Because Plaintiffs had not articulated a methodology for determining part inferiority, but had only proffered the opinion of Mr. Wood that an expert other than himself could establish such a methodology by the time of trial, the Court found that it was unable to engage in the scrutiny required by Ellis. (Id.) In addition, because Plaintiffs' class definition itself incorporates the idea that only certain categories of parts are inferior, the Court found that the class was not ascertainable until the categories of inferior parts were delineated. (Id.) Accordingly, the Court denied Plaintiffs' Motion, but reopened discovery for the limited purpose of allowing Plaintiffs to proffer an expert regarding which categories of non-OEM parts fit the definition set forth in Plaintiffs' proposed class definition. (Id.)

---

[9] (See Order Denying Defendant GEICO's Motion to Disqualify and Defendants' Motions to Exclude, hereafter, "December 7 Order," Docket Item No. 581.)

[10] (See Order Denying Plaintiffs' Motion for Class Certification Without Prejudice, hereafter, "May 2 Order," Docket Item No. 612.)

[11] 657 F.3d 970, 982-84 (9th Cir. 2011).

3

On May 21, 2012, Plaintiffs submitted a Supplemental Expert Report from Mr. Wood.[12] On June 21, 2012, Defendants submitted the rebuttal expert reports of M. Laurentius Marais,[13] Dr. Michelle Vogler,[14] and James Watson.[15]

Presently before the Court are Defendants' Motion to Exclude the Testimony of Mr. Wood and Plaintiffs' Second Renewed Motion for Class Certification. Because Defendants' Motion to Exclude may be dispositive of both Motions, the Court considers it first.

## III. STANDARDS

Rule 702 requires that a testifying expert be "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. The threshold for qualification is low: a minimal foundation of knowledge, skill, and experience suffices. Hangarter v. Provident Life & Accident Ins. Co., 373 F.3d 998, 1015-16 (9th Cir. 2004); see also Thomas v. Newton Int'l Enterprises, 42 F.3d 1266, 1269 (9th Cir. 1994). When faced with a proffer of expert testimony, a district court must determine whether the testimony is both reliable and relevant. Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589 (1993) ("Daubert I"). The court has broad discretion in assessing both requirements. See United States v. Alatorre, 222 F.3d 1098, 1100 (9th Cir. 2000).

The reliability requirement ensures "that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999). The offering party must show by a preponderance of the evidence (1) that the expert is qualified to render the opinion and (2) that the opinion offered has adequate support. Daubert I, 509 U.S. at 588-90. Expert testimony is not admissible if it is

---

[12] (Supplemental Expert Parts Declaration of Allen Wood, hereafter, "Wood Supplemental Report," Docket Item No. 618-1.)

[13] (Report of M. Laurentius Marais, hereafter, "Marais Report," Docket Item No. 634-1.)

[14] (Third Supplemental Report of Michelle M. Vogler, Ph.D., P.E., hereafter, "Vogler Report," Docket Item No. 634-2.)

[15] (Declaration of James Watson in Response to Supplemental Report of Allen Wood, hereafter, "Watson Decl.," Docket Item No. 634-4.)

4

1 speculative. See Gen. Elec. v. Joiner, 522 U.S. 136, 146 (1997). To satisfy the relevance
2 requirement, the proffered expert testimony must assist the trier of fact in understanding or
3 determining a fact in issue. Daubert I, 509 U.S. at 591. In assessing relevance, the court must look
4 to the governing substantive legal standard. See Daubert v. Merrell Dow Pharms., Inc., 43 F.3d
5 1311, 1320 (9th Cir. 1995) ("Daubert II").

## IV. DISCUSSION

7 Defendants move to exclude the testimony of Mr. Wood, on the grounds that Mr. Wood did
8 not utilize any scientific or statistically grounded methodology in formulating his opinion as to
9 which categories of non-OEM parts are inferior to OEM parts. (Motion at 2-5.) Plaintiffs respond
10 that Mr. Wood's experience in automotive repair parts qualifies him to opine on which categories of
11 non-OEM parts are categorically inferior, and Defendants' objections affect only the weight, and not
12 the admissibility, of his testimony.[16]

13 In assessing whether an expert opinion is sufficiently reliable, "the test under Daubert is not
14 the correctness of the expert's conclusions but the soundness of his methodology." Daubert II, 43
15 F.3d at 1318. A methodology may not be reliable if an expert "fail[s] to address and exclude
16 alternative explanations for the data on which he bases his findings" or "reject[s] studies reporting
17 contrary empirical findings." Carnegie Mellon Univ. v. Hoffman-LaRoche, Inc., 55 F. Supp. 2d
18 1024, 1034-35 (N.D. Cal. 1999). In addition, a court may exclude expert testimony on the ground
19 that an expert's purported methodology fails to explain his final conclusion. See Joiner, 522 U.S. at
20 146 ("[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit
21 opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may
22 conclude that there is simply too great an analytical gap between the data and the opinion
23 proffered."). Finally, the court should consider whether an expert prepared his methodology for
24 purposes of litigation, or articulated the methodology before litigation and without any incentive to
25 reach a particular outcome. See Daubert II, 43 F.3d at 1317.

---

27 [16] (Plaintiffs' Opposition to Defendants' Second Joint Motion to Exclude Testimony of Expert Allen Wood at 6-18, hereafter, "Opp'n," Docket Item No. 643.)

United States District Court
For the Northern District of California

1    Here, the Court has previously qualified Mr. Wood as an expert in the quality of automobile
2 repair parts.[17] Mr. Wood has over thirty years of experience as a supervisor of smog check
3 inspections with the State of California Bureau of Automotive Repair ("BAR") and was responsible
4 for drafting BAR's Crash Part Certification Study of 2003. (Id. at 10-11.) Mr. Wood also has an
5 Associate of the Arts degree in Automotive Repair from Rio Hondo Junior College.[18] In his
6 previous report, Mr. Wood opined that Plaintiffs would be able to provide common proof as to
7 which categories of non-OEM parts create a significant probability of an unsafe repair, but did not
8 himself opine on what methodology would be used to discern these categories.[19] In response to the
9 Court's May 2 Order, Plaintiffs offer the Supplemental Report of Mr. Wood as containing a
10 methodology to ascertain inferior categories of parts.[20]

11    In his Supplemental Report, Mr. Wood opines that as to six categories[21] of aftermarket parts
12 and four categories of salvage parts,[22] there is at least a 25% probability that the use of these parts
13 "will lessen the quality of the automobile's repair as to safety, fit, structural integrity or mechanical
14 functioning than [sic] would be experienced over the life of a high-quality OEM repair part." (Id. at
15 7, 26.) Mr. Wood states that he "engaged in a systematic survey of various studies or analyses
16 assessing the quality of categories of imitation and salvage parts as foundations for [his] opinions as

---

[17] (December 7 Order at 10.)

[18] (Transcript of July 9, 2012 Hearing Proceedings at 43:25-44:2, hereafter, "Hearing Transcript," Docket Item No. 656.)

[19] (See Declaration of Bonnie Lau in Support of Defendants' Joint Motions to Exclude Plaintiffs' Purported Experts Roger G. Noll, Donald T. Bashline, and Allen Wood, hereafter, "Lau Decl.," Ex. O, Rebuttal Class Declaration of Allen Wood at 4, hereafter, "Wood Decl.," Docket Item No. 475-3.)

[20] (Wood Supplemental Report at 1.)

[21] These categories of parts include: hoods, fenders, bumper covers, bumper reinforcements and brackets, energy absorbers and lighting devices. (Wood Supplemental Report at 7-8.)

[22] The four categories of salvage parts are quarter panels, suspension parts, structural components (excluding hoods) and clips. (Id. at 26-27.)

6

to which parts categories fit the problem criteria." (Id. at 4.) In particular, Mr. Wood states that in this survey he considered seven categories of information, consisting of:

> (1) a State of California study in part conducted by [Mr. Wood] and a hearing record; (2) wide-ranging expert and lay testimony over several years by body shop owners and employees who use these parts on thousands of California vehicles each year; (3) the vast and long-term experience of Mr. Toby Chess, [Mr. Wood's] consulting collision analyst who has years of experience in the industry; (4) the many studies by collision repair associations over several years, including those of the Society of Collision Repair Specialists; (5) the statements and findings of the Defendant insurance companies themselves as to the relative quality of imitation and salvage parts; (6) OEM studies contrasting these parts to those of the OEMs for safety, fit, structural integrity or mechanical functioning; and (7) studies by reputable consumer publications like Consumer Reports.

(Id. at 5.) On the basis of these materials, Mr. Wood "designate[s] a parts category a problem category if, in [his] opinion, that use of imitation or salvage parts in a category significantly lessens the quality of an automobile's repair as to safety, fit, structural integrity or mechanical functioning than [sic] would be experienced over the life of a high-quality OEM repair part." (Id.) Mr. Wood defines a problem category as one where "at least 25% or more of the parts are likely to be substandard under the 'safety, fit, structural integrity or mechanical functioning' criteria." (Id.)

To challenge the reliability of Mr. Wood's methodology, Defendants proffer the reports and testimony of two experts, Dr. M. Laurentius Marais and Dr. Michelle Vogler.

Dr. Marais holds a Ph.D. and master's degrees in business administration, mathematics and statistics from Stanford University.[23] Dr. Marais is also a fellow of the Royal Statistical Society and has served on the faculties of both the University of Chicago and Stanford University. (Id.) Dr. Marais challenges the procedural accuracy of Mr. Wood's methodology. Specifically, Dr. Marais opines that although Mr. Wood "attempted to perform what statisticians term a 'systematic review'" of pertinent material, "he failed to meet generally accepted, basic statistical requirements for a valid analysis of this kind." (Id. ¶ 4.) Dr. Marais further opines that Mr. Wood's survey "does not rise to the level of a 'methodology': it was inadequately conceived, biased in its implementation, materially incomplete, and at times incoherent." (Id.) At the evidentiary hearing, Dr. Marais elaborated on his criticisms of Mr. Wood's report as follows:

---

[23] (See Marais Report ¶ 1.)

7

> As a statistician, I would interpret [a methodology] as, in effect, a recipe, a replicable and a reproducible recipe for recognizing and assembling appropriate inputs having to do with some question that was being studied, processing those inputs using established statistical methods in order to arrive at a conclusion.[24] [D]oing all of that in such a way that the entire process could be explained to another person [with the] appropriate background knowledge, who could then go and implement the same procedure and arrive at essentially the same result . . . that reproducibility would be the hallmark that makes it a scientifically valid procedure. (Id. at 140:17-140:23.) Mr. Wood's procedure in this case does not conform to those minimum standards. (Id. at 142:8-142:9.)
>
> Mr. Wood's current report deals with percentages and probabilities. (Hearing Transcript at 144:3-144:4.) But with respect to the percentages, it is never clear and it is never stated explicitly in Mr. Wood's report what the percentage actually is. (Id. at 144:4-144:7.) It is a numerator divided by a denominator, but what is to be counted in the numerator and denominator is not clear. (Id. at 144:7-144:8.) We know from the report, I can tell, that the numerator counts something that is substandard, but what substandard means precisely and whether what is being counted is individual units of aftermarket parts or individual parts numbers, which are referred to in a number of Mr. Wood's supporting documents, even that is left unclear. (Id. at 144:9-144:16.)
>
> Beyond that . . . Mr. Wood . . . makes the conceptual leap from percentages of some aggregate universe, or some aggregate category of aftermarket parts, to probabilities. (Hearing Transcript at 144:21-144:24.) But a percentage, even though it looks like a probability, is not, per se, a probability. (Id. at 144:24-145:1.) An individual member of the proposed class needing a repair would need that repair not to some vehicle, in general, but to a particular vehicle. (Id. at 146:6-146:9.) It would either be an early model Honda Accord or a late model BMW or a Ford Probe, or some other particular vehicle of a particular make and model and model year. (Id. at 146:9-146:11.) So to go from a single aggregate percentage describing the universe of aftermarket parts, in general, to probabilities of substandard repairs encountered by individual members of the class, it's a bridge too far. (Id. at 146:19-146:22.)

Dr. Michelle Vogler holds a Ph.D. in mechanical engineering from Stanford University.[25] Dr. Vogler is a principal at Design Research Engineering, an engineering consulting firm, and has worked for a number of OEM producers within the automotive industry conducting parts analysis and accident reconstruction. (Id.) Dr. Vogler challenges the substantive value of Mr. Wood's methodology. Specifically, Dr. Vogler offers the following criticism:

> The information that Mr. Wood sets forth in his Declaration . . . is not based on a sound or accepted method of scientific inquiry in the field of engineering, or any field of study with which I am familiar. (Vogler Report at 2.) Mr. Wood provided unscientific and inadequate information to understand what specific types of parts are within his ten part categories. (Id.) The category of "Structural Components (excluding Hoods)" is an example of Mr. Wood's insufficient category definition. (Id. at 3.) His Declaration provides no description of what he considers a "structural" component, nor does he provide a list of specific parts that would fall within this category. (Id.) From an engineering standpoint,

---

[24] (Hearing Transcript at 140:9-140:14.)

[25] (See Lau Decl., Ex. C, Report of Michelle Vogler at 1, Docket Item No. 475-1.)

8

whether a part is considered structural or not depends on the specific design of the vehicle. (Id.) It is completely inappropriate to use the characteristics of one vehicle's structural components to make any assessment about a different vehicle's structural components. (Id. at 4.)

Mr. Wood's Declaration completely omits any evidence in his reported findings about the quality of "OEM repair parts", [sic] yet he asserts repeatedly that these parts are "high quality." (Vogler Report at 10.) Conversely, Mr. Wood's Declaration completely omits any evidence about the quality of [s]alvaged parts, yet he asserts repeatedly that these are "inferior" parts. (Id.) Mr. Wood says that if a part is likely to be inadequate as to fit, safety, structural integrity, or mechanical functioning at least 25% or more of the time, it is "inferior." (Id.) Yet Mr. Wood repeatedly acknowledged at his deposition that he did nothing to measure the failure rate of comparable OEM parts, and . . . there is a substantial body of literature indicating that OEM failure rates are higher than 25%. (Id.)[26]

Upon review, the Court finds that the process articulated by Mr. Wood for identifying problem categories does not rise to the level of a methodology, and thus is not sufficiently reliable to pass muster under Daubert. In particular, the Court finds that Mr. Wood's failure to identify any methodology for choosing which surveys and reports to include in his analysis render this analysis far too subjective to constitute a workable methodology. When asked to elaborate on what documents he chose to use in his analysis, Mr. Wood testified that he relied largely on documents which he either had on hand or that were sent to him by Plaintiffs' counsel.[27] When asked how one would be able to judge whether he selected the right data to include, Mr. Wood replied that "my experience and my report speak for itself."[28] The Court finds, however, that this is precisely the type of *ipse dixit* that is not permissible under Daubert.[29]

---

[26] Defendants also rely on the report of Mr. James Watson, former president of the Automotive Recyclers Association, who "strongly disagree[s]" with Mr. Wood's conclusions, and opines that Mr. Wood "failed to consider several distinct advantages to the use of recycled parts. (Watson Decl. ¶¶ 1, 19.) Because the Court finds that Mr. Watson's Report addresses primarily the accuracy of Mr. Wood's conclusions, rather than the soundness of his methodology, the Court does not rely upon it in considering Mr. Wood's methodology and does not discuss its contents in greater detail.

[27] (Declaration of Bonnie Lau in Support of Defendants' Joint Motion to Exclude Testimony of Plaintiffs' Supplemental Parts Expert Allen Wood, Ex. A., June 13, 2012 Deposition of Allen Wood at 134:12-136:6; 15:21-17:24, hereafter, "Wood Depo. II," Docket Item No. 637-1.)

[28] (Wood Depo. II at 161:9-161:16.)

[29] See Joiner, 522 U.S. at 146.

9

Mr. Wood's lack of an articulated methodology for choosing which sources to rely upon is particularly troubling, in light of evidence that the sources consulted may have been systematically skewed towards demonstrating non-OEM inferiority. In addition to relying primarily on documents that he had on hand or that were sent to him by Plaintiffs' counsel, Mr. Wood testified that he selected sources that "represented what [he] was trying to put forward."[30] Mr. Wood further testified that he did not make any effort to seek out sources that would support a contrary view.[31] However, the Court finds that this is precisely the type of methodology that is "biased toward a particular conclusion" and therefore does not "comport[] with the dictates of good science." Daubert II, 43 F.3d at 1317.

In addition, even assuming *arguendo* that the sources relied upon by Mr. Wood did constitute a valid and unbiased collection from which one could derive a conclusion, the Court finds that they do not actually support the numerical conclusions at which Mr. Wood arrives. Neither in his report, nor at any point during his testimony at the evidentiary hearing, did Mr. Wood provide any support for the idea that the categories identified by him create a 25% or higher probability of an unsafe repair. Rather, Dr. Marais testified that based on his review of the cited materials, they did not provide any "statistically explicit data from which [he] can see a rational way of arriving at the conclusion of greater that 25 percent rate of substandard repairs."[32] Even Mr. Wood himself, when asked how one could apply his methodology to determine if any categories had been wrongly excluded from his definition of a problem category, responded that any person attempting to do so would have to obtain thirty years of experience in the industry and utilize his experience and personal knowledge to survey the available data and arrive at his own conclusion.[33] Thus, Mr. Wood acknowledged that the process he used to arrive at his conclusions is not replicable in any sort

---

[30] (Wood Depo. II at 157:24-158:8.)

[31] (Id. at 138:3-138:18.)

[32] (Hearing Transcript at 162:24-163:2.)

[33] (Id. at 33:17-36:23.)

10

1  of predictable manner, which provides further support for the Court's conclusion that this process
2  does not rise to the level of a methodology.

3  Finally, it is worth noting that Mr. Wood's Supplemental Report is not responsive to the
4  requirements of the Court's May 2 Order. In that Order, the Court required Plaintiffs to submit an
5  expert "on the subject of which categories of non-OEM parts are inferior to OEM parts." (May 2
6  Order at 4.) Mr. Wood's report is dedicated in its entirety to establishing that the categories of non-
7  OEM parts he deems to be problem categories are indeed inferior to OEM parts.[34] However, Mr.
8  Wood does not make any attempt to establish that those categories of parts not discussed would not
9  meet his own definition of inferiority. Thus, the Court has no way of comparing those categories
10 Mr. Wood deems problematic with those he does not, or even of discerning whether Mr. Wood
11 himself attempted to assess whether other categories of parts might fit his definition of a problem
12 category. This is particularly troubling because these categories are built into Plaintiffs' proposed
13 class definition, and thus would determine which of Defendants' customers are included in the class
14 if certified. Thus, even if Mr. Wood were successful in demonstrating that certain categories of non-
15 OEM parts are inferior, he would not have succeeded in distinguishing which parts are inferior from
16 those that are not, as would be necessary to establish an ascertainable class which could be certified.

17 Plaintiffs contend that Defendants' objections to Mr. Wood's opinions merely rehash the
18 arguments raised in their previous Daubert motion to exclude Mr. Wood's testimony altogether, and
19 thus have already been rejected by the Court.[35] The Court finds, however, that this contention is
20 misguided. Mr. Wood's initial expert report was offered in rebuttal to an earlier expert report
21 provided by Dr. Vogler, and merely opined that based on the widespread problems he had observed
22 with non-OEM parts, "class wide expert and other common proof as to the members of each class of
23 insureds will be available at trial" to identify the categories of parts that create a risk of unsafe

---

[34] (See Wood Report.)

[35] (Opp'n at 13.)

11

1 repair.[36] The Court concluded that based on Mr. Wood's extensive experience in the automotive
2 field, he was qualified to opine on the quality of non-OEM parts, and to interpret studies regarding
3 part quality. (December 7 Order at 10-12.) At that juncture, Mr. Wood had not himself attempted to
4 put forth a comprehensive methodology for assessing which categories of non-OEM parts are
5 inferior, which means that the reliability of such a methodology was not before the Court.[37] Having
6 ordered Plaintiffs to produce a methodology for identifying inferior parts, the Court must now
7 determine whether Plaintiffs' proffered methodology is sufficiently reliable to pass muster under
8 Daubert. Because the Court finds that the process utilized by Mr. Wood does not rise to the level of
9 a methodology at all, that process is not admissible into evidence.

10 In sum, the Court finds that the process employed by Mr. Wood does not constitute a
11 replicable methodology, and thus is not sufficiently reliable to be admissible under Daubert.
12 Accordingly, the Court GRANTS Defendants' Motion to Exclude. Because Plaintiffs have failed to
13 provide an admissible methodology for categorizing parts, as was required by the Court's May 2
14 Order, the Court DENIES Plaintiffs' Renewed Motion for Class Certification.

### V. CONCLUSION

16 The Court GRANTS Defendants' Motion to Exclude the Supplemental Expert Report of Mr.
17 Wood. The Court DENIES Plaintiffs' Renewed Motion for Class Certification with prejudice.
18 Having denied Plaintiffs' Motion for Class Certification with prejudice, the Court now turns
19 to the issue of whether Plaintiffs may maintain this litigation on an individual basis. Accordingly,
20 on or before **July 27, 2012**, the parties shall file simultaneous briefs addressing the issue of whether
21 the Court's rejection of Mr. Wood's methodology for categorizing parts is also fatal to Plaintiffs'
22 case on an individual basis.

---

[36] (See Wood Decl. at 4.)

[37] (See Wood Decl.)

12

The parties shall appear on **August 6, 2012 at 9 a.m.** for a hearing on this issue.

Dated: July 31, 2012

JAMES WARE
United States District Chief Judge

**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

Andrew M. Hetherington ahetherington@khhte.com
Beverly Carol Moore bmoore@khhte.com
Bonnie Lau bonnie.lau@snrdenton.com
Brian J. Devine bdevine@seegersalvas.com
Cari K. Dawson cari.dawson@alston.com
Carol A. Rutter carol.rutter@husch.com
Carol A. Rutter carol.rutter@huschblackwell.com
Christopher Allen Riley chris.riley@alston.com
Colleen Duffy-Smith cduffysmith@mdstlaw.com
David A. DeGroot ddegroot@sheppardmullin.com
Erica L. Fenby erica.ghali@alston.com
Frank Falzetta ffalzetta@sheppardmullin.com
Ian M. Fischer ifischer@swlaw.com
Ian M. Fischer ifischer@swlaw.com
James McManis jmcmanis@mcmanislaw.com
James Daniel Leftwich dleftwich.law@gmail.com
Joseph Anthony Cancila jcancila@schiffhardin.com
Kenneth Mark Seeger kseeger@seegersalvas.com
Mark G. Arnold mark.arnold@huschblackwell.com
Melissa Mahurin Whitehead melissa.whitehead@alston.com
Michael Gannon Reedy mreedy@mcmanislaw.com
Michael P. Kenny mike.kenny@alston.com
Randall Lee Allen randall.allen@alston.com
Raoul Dion Kennedy rkennedy@skadden.com
Richard John Zuromski rzuromsk@skadden.com
Richard L. Fenton rfenton@sonnenschein.com
Robert J. Gibson hgibson@swlaw.com
Robert Stephen Berry sberry@berrylawpllc.com
Robyn Denise Buck robyn.buck@huschblackwell.com
Sheila K Carmody scarmody@swlaw.com
Steven F. Benz sbenz@khhte.com
Steven F. Benz sbenz@khhte.com
Steven H. Frankel steven.frankel@snrdenton.com

**Dated:  July 31, 2012**                               **Richard W. Wieking, Clerk**

                                                        **By:     /s/ JW Chambers**
                                                                **William Noble**
                                                                **Courtroom Deputy**

**United States District Court**
For the Northern District of California